NEIL McDADE et al., Appellants-Appellees, v. EVEREST McDADE et al., Appellees. —325 S. W. (2d) 575.

Eastern Section, Knoxville. November 25, 1958.

Certiorari denied by Supreme Court May 1, 1959.

488

490

Harry Berke, Chattanooga, for Clint McDade, appellant.

Robert C. McEwan, Chattanooga, for Edith McDade and guardian ad litem for Everest McDade, appellees.

Speers, Moore, Rebman & Williams, Chattanooga, for Neil McDade, Grace Everest McDade, Ruth McDade, Dorothy McDade Ferguson, Southland News Co., a partnership, Southland News Co., Inc., a corporation, Clint McDade & Sons, Inc., a corporation, and Pepsi-Cola Bottling Co. of Chattanooga, a corporation—appellants-appellees.

CARNEY, J. This litigation involves the validity of the contracts of sale by Clint McDade, Everest McDade and his wife Edith McDade of their several interests in several different businesses sometimes collectively referred to in the record as the McDade enterprises. The purchasers of these interests were Neil McDade; his wife, Ruth McDade; his mother, Grace Everest McDade; and his sister, Dorothy McDade Ferguson.

Clint McDade is the father of Everest McDade, Neil McDade, and Dorothy McDade Ferguson. He was formerly the husband of Grace Everest McDade who is the

mother of Everest and Neil McDade and Dorothy McDade Ferguson. Grace Everest McDade obtained an uncontested divorce from Clint McDade at his insistence in March, 1950.

The contract price for the purchase of the interests of Clint McDade in said businesses was $300,000. The contract price for the purchase of the interests of Everest and Edith McDade was $150,000.

These contracts of sale were dated January 14, 1950, and finally executed about February 22, 1950. The transactions were so complex that it took sixty-three separate documents to complete the transfer of the various interests in said businesses.

By their cross-bills Clint McDade, Everest McDade and wife, Edith McDade sought to rescind their contracts of sale primarily on the grounds of lack of mental capacity and undue influence. After verdict by an advisory jury, the Chancellor dismissed the cross-bill of Clint McDade but sustained the cross-bill of Everest McDade and his wife, Edith McDade.

There are two separate appeals before this Court for decision:

(1) Clint McDade appeals from the action of the Chancellor in dismissing his cross-bill and he has assigned some ten assignments of error.

The purchasers, Neil McDade, Ruth McDade, Grace Everest McDade and Dorothy McDade Ferguson, are the appellees to the appeal of Clint McDade.

(2) Neil McDade, Ruth McDade, Grace Everest McDade, and Dorothy McDade Ferguson are appellants

from the action of the Chancellor in sustaining the cross-bill of Everest McDade and wife, Edith, and in ordering their contracts of sale rescinded. They have made some sixteen assignments of error. On this appeal Everest McDade and wife, Edith McDade, are the appellees.

There were two separate jury trials below. The second trial consumed some twelve trial days. The record is voluminous, consisting of approximately 3,900 type-written pages in eighteen volumes. Our task in reviewing such a record has been aided greatly by the excellent indices prepared by the Clerk and Master of the Chancery Court of Hamilton County and by the excellent briefs submitted by solicitors for the parties.

Clint McDade, the father, was the founder of and guiding spirit behind the several businesses involved in this litigation. It was through his generosity that most of the other parties became the owners of their interests in these businesses.

Prior to January 14, 1950, the date of the contracts of sale by Clint, Everest and Edith McDade, the McDade family owned and operated the following businesses involved in this litigation:

1. Clint McDade and Sons, a corporation, engaged in the business of growing and selling orchids, located in Chattanooga, Tennessee.

2. Southland News Company, a partnership, engaged in the business of distributing magazines with its principal place of business in Chattanooga, Tennessee.

3. Southland News Company, Inc., a corporation, also a magazine distributing business and, in

reality, a successor to Southland News Company, described above.

4. Pepsi Bottling Company of Chattanooga, Tennessee, a business engaged in bottling and selling non-alcoholic beverages.

5. Semmes Nursery, a partnership, of Mobile, Alabama.

6. Signal Nursery, a partnership of Chattanooga, Tennessee, engaged in raising peonies.

Prior to January 14, 1950, the several businesses were owned by the several parties as follows:

1. Clint McDade and Sons, a corporation:

| | |
|---|---|
| Clint McDade | 25% |
| Grace Everest McDade | 25% |
| Neil McDade | 25% |
| Everest McDade | 25% |

2. Southland News Company, a partnership:

| | |
|---|---|
| Clint McDade | 26% |
| Grace Everest McDade | 26% |
| Neil McDade | 16% |
| Dorothy McDade Ferguson | 16% |
| Everest McDade | 16% |

3. Southland News Company, Inc., a corporation:

| | |
|---|---|
| Clint McDade | 26% |
| Grace Everest McDade | 26% |
| Neil McDade | 16% |
| Dorothy McDade Ferguson | 16% |
| Everest McDade | 16% |

4. Pepsi Bottling Company, Inc., a corporation:

| | |
|---|---|
| Clint McDade | 25% |
| Grace Everest McDade | 25% |
| Neil McDade | 25% |
| Everest McDade | 25% |

5. Semmes Nursery, a partnership:

| | |
|---|---|
| Ruth McDade (Wife of Neil) | 25% |
| Edith McDade (Wife of Everest) | 25% |
| Grace Everest McDade (Former wife of Clint) | 25% |
| Fannie Coflin (Widow of business associate of Clint McDade) | 25% |

6. Signal Nursery, a partnership:

| | |
|---|---|
| Ruth McDade (Wife of Neil) | 50% |
| Edith McDade (Wife of Everest) | 50% |

For some three years or more prior to January 14, 1950, there had existed considerable friction among the leadership of the McDade enterprises. Everest, as president of Clint McDade and Sons, the orchid business, had incurred the displeasure of the others, primarily Clint and Neil, because of his inability to get along with the employees.

In December, 1948, Everest surrendered his presidency of Clint McDade and Sons, ceased active management thereof, and went back to school at the University of Chattanooga where he completed his work for a degree in engineering.

Clint McDade became very much displeased when Neil McDade and Grace Everest McDade, then Clint's wife,

appeared to side against Clint by voting to pay Everest $10,000 per year while he was going back to school.

The friction increased, profits disappeared, culminating in the realignment of the interests of the parties in the various enterprises by the contracts of date January 14, 1950.

Under their contracts Everest McDade and his wife, Edith McDade, sold all of their interests in and became entirely separated from all of the McDade Enterprises except Signal Nursery, a peony farm, located on Signal Mountain near Chattanooga. This business was of little value in comparison with the other businesses.

The purchase price of $150,000 was payable $25,000 in cash and the balance of $125,000 payable $7,500 per year with interest at 2½% per annum. The unpaid purchase price was secured by stock in one or more of the McDade enterprises. These annual instalments of principal and interest have all been paid on time and there is no delinquency in the payment of the purchase money.

Under his contract Clint McDade was separated from all of his interests in all of the McDade enterprises except Semmes Nursery located at Mobile, Alabama. It will be remembered that Semmes Nursery was operated as a partnership and Ruth McDade, wife of Neil, owned 25%, Edith McDade, wife of Everest, owned 25%, Grace Everest McDade, wife of Clint McDade, owned 25%, and Fannie Coflin, widow of a former business associate and close friend of Clint McDade, owned 25%.

Clint McDade became the purchaser of the one-fourth interest each of Ruth McDade, Edith McDade and Grace

Everest McDade leaving him in partnership with Fannie Coflin, the widow of his long-time friend and business associate. On May 19, 1950, Clint McDade purchased the remaining one-fourth interest in Semmes Nursery from Fannie Coflin which purchase was made retroactive to January 31, 1950.

Neil McDade and wife, Ruth McDade, Grace Everest McDade and Dorothy McDade Ferguson as the new owners of the various McDade enterprises, exclusive of Semmes Nursery, have been in the possession of and operating said businesses as corporations and partnerships continuously from January, 1950, to the present time.

Clint McDade has continued to operate the Semmes Nursery to the present time.

Everest McDade and wife, Edith McDade, have been completely separated from all of the McDade enterprises since January, 1950. Everest McDade now lives in Asheville, North Carolina, where he is employed as an engineer for International Resistance Company. He and his wife have been living on his salary as such engineer and upon the periodic payments of interest and principal made to them by Neil McDade et al. under the contracts of purchase above referred to.

For several years prior to 1950 the Internal Revenue Service had contended that neither Everest McDade nor Dorothy McDade Ferguson was a partner in the Southland News Company and that for income tax purposes the taxes paid by the various partners on their income from Southland News Company should be re-allocated for the years 1942 through 1945. This controversy was

still pending at the time of the sale by Everest and Edith McDade of their interests to Neil McDade et al.

The Internal Revenue Service finally determined the controversy adversely to the contention of the parties and ruled that Everest McDade and Dorothy McDade Ferguson were not legally partners in Southland News Company during the years 1942, 1943, 1944, 1945 and 1946. A deficiency for these years was assessed against Clint McDade in the amount of $51,450.65 and a deficiency was assessed against Grace Everest McDade for $51,011.18.

This adjudication was made after the sales by Everest and Edith McDade had been completed in February, 1950.

Everest McDade and wife, Edith McDade, as a result of this ruling, were awarded a refund in their income taxes for the above years which together with interest totalled $38,000.

Dorothy McDade Ferguson likewise received an award of a refund for the same period of time as a result of the ruling that she was not a member of the partnership of Southland News Company within the contemplation of the income tax laws.

Neil McDade, Grace McDade and Dorothy McDade Ferguson as purchasers had agreed to assume any income tax deficiency which might be assessed by the Internal Revenue Service against Grace Everest McDade and Clint McDade. Neil McDade, Grace Everest McDade and Dorothy McDade Ferguson contended that the refunds awarded to Everest and Edith McDade should be

applied toward the payment of the deficiency assessed against Clint McDade and Grace Everest McDade.

They relied primarily upon the terms and provisions of two contracts executed by the parties in the course of the sale and transfer of the several interests of the McDade enterprises above referred to.

From a contract signed by the parties dated February 10, 1950, we quote as follows:

"Whereas, A final determination of the proper allocation of the income tax due on the respective partners because of the income from said Southland News Company partnership may result in an over-assessment and refund to several members of the partnership and a deficiency assessment against the remaining members of the partnership who are not finally entitled to a refund;

"Now, Therefore, The parties hereto agree that should one or more members of the partnership receive a refund, including interest, as a result of a final determination that the Southland News Company partnership was invalid in whole or in part for Federal income tax purposes as to one or more partners such refund, the interest included, will be applied in full on any deficiency which may be assessed against those members of the partnership who do not receive a refund; the balance of such deficiency will be borne 25% by Clint McDade and the remaining 75% of such deficiency not offset by the refund will be borne by the remaining partners, excepting Dorothy McDade Ferguson, in proportion to their partnership interest. This agreement is to be limited to the deficiencies arising solely because

of the allocation or reallocation of income from said Southland News Company partnership for the years 1942, 1943, 1944, and 1945.

"Executed this 10th day of February, 1950.

"Neil McDade

"Ruth Cline McDade

"Grace Everest McDade

"Clint McDade

"Everest McDade

"Edith Porten McDade

"Dorothy McDade Ferguson
"By

"Neil McDade
"Attorney in Fact"

In addition, on February 22, 1950, Everest McDade and wife, Edith McDade, entered into a supplemental contract in which they made reference to the former contract and sale of property between the parties and which contract of date February 22, 1950, expressly recited as follows:

"Everest McDade and Edith Porten McDade agree that should there be paid to either of them any refund from the United States Government because of over-assessment of Federal income taxes for the years 1942 to 1949, inclusive, because of the re-allocation of income from Southland News Company, a partnership, or Semmes Nurseries, a partnership, or because of any adjustment of income due

to their connection with Southland News Company, a corporation, Pepsi Cola Bottling Company of Chattanooga, and/or Clint McDade & Sons, Inc., such refunds, including the interest thereon, will be applied in full against any income tax deficiency assessed against any of the partners, stockholders or corporation, which may result from the re-allocation of adjustment of income.

"This the 22nd day of February, 1950.

"(Signed) Neil McDade

"(Signed) Everest McDade

"(Signed) Edith Porten McDade"

Dorothy McDade Ferguson fully complied with the terms of her contract and applied her income tax refund toward the payment of the deficiencies assessed against Clint McDade and Grace Everest McDade mentioned above.

Everest and Edith McDade refused to apply their refund under the terms of their agreement and on September 18, 1951, in the Chancery Court of Hamilton County, Tennessee, Neil McDade and Grace Everest McDade filed their original bill against Everest McDade and wife, Edith McDade, along with several of the corporate McDade enterprises as parties defendant in which they sought to recover the $38,000 and to apply it toward the payment of the deficiencies above referred to. Thus began the protracted litigation in this cause.

Everest and Edith McDade filed a cross-bill impleading additional parties and seeking a rescission of their contracts of sale on the grounds of fraud, duress and

misrepresentation. A trial was had on the original bill and the cross-bill before a jury in July, 1952, resulting in verdicts by the jury in favor of Everest and Edith McDade on the grounds of duress and misrepresentation but the jury returned a verdict against them on the question of fraud.

On May 13, 1953, the then Chancellor, Honorable Alvin Ziegler, now deceased, granted a new trial for the following reasons: ''Because of my opinion that the issues submitted to the jury were not properly framed and that confusion resulted therefrom and because of my doubt as to the competency of some of the evidence submitted complainant's motion for a new trial will be sustained.''

Thereafter the cross-bill of Everest and Edith McDade was amended so as to make the Hamilton National Bank a cross-defendant and Everest McDade sought recovery of the sum of $28,500 for the alleged conversion of his promissory note in said amount because the Bank had surrendered the note to Clint McDade.

The cross-bill also sought to recover an attorney's fee of $5,000 paid to Honorable Raymond Witt of the Chattanooga Bar who had represented Everest and Edith McDade in the negotiations leading up to and culminating in the sale of their interests in the McDade enterprises.

On October 13, 1953, Clint McDade filed an answer and a cross-bill setting out his former interests in the McDade enterprises and averring that he had sold his interests at a grossly inadequate price and that the contracts were induced by fraud, duress and undue influence and that he was mentally incompetent at the time he was induced to sign said contracts.

Chancellor Ziegler died before the case came on for retrial and he was succeeded by Chancellor Clifford Curry. On April 1, 1954, an order was entered disallowing a demand for a jury trial made by Everest McDade and wife, Edith McDade, and by Clint McDade and the cause was set for hearing on oral proof. To this action Everest McDade, Edith McDade and Clint McDade all excepted and prayed an appeal which was denied. (Tr., Tech. Record, Vol. II, Page 272)

After all the parties defendant to the several cross-bills had filed answers and the pleadings were completed, the cause was set for trial before Chancellor M. B. Finkelstein on October 12, 1956.

Chancellor Finkelstein, on his own motion, ordered issues submitted to an advisory jury under the authorities of Lawson v. Cooper, 37 Tenn. App. 339, 263 S. W. (2d) 763, and Gibson's Suits in Chancery, 5th Edition, Section 596.

On November 27, 1956, after the case had been set for trial, the Chancellor permitted Everest to amend his cross-bill so as to aver the lack of mental capacity to execute the contracts as above set out.

Everest and Edith McDade were represented first by Honorable Spears McAllister, of the Chattanooga Bar, who drafted their answer and first cross-bill. Subsequently they were represented by Honorable Robert McEwan of the Chattanooga Bar. Upon the trial Mr. McEwan continued to represent Edith McDade but Everest interrogated the witness as his own attorney.

The trial was begun on January 15, 1957, before an advisory jury and lasted some twelve trial days.

The issues submitted to the jury and their findings thereon are as follows:

"I. Everest and Edith McDade—Issue

"(1) Was the sale by Mr. and Mrs. Everest Mc-Dade of their interests in the McDade enterprises for a grossly inadequate consideration? Answer: No.

"(2) When the contracts of sale were entered into in January and February of 1950 was Everest McDade possessed of sufficient mental capacity to enter into a valid contract? Answer: No.

"(3) If your answer to No. 2 is 'No' was Everest McDade's mental incapacity known to Mr. and Mrs. Neil McDade and Grace Everest McDade? Answer: Yes.

"II. Clint McDade—Issues

"(1) When the contracts of sale were entered into in January and February, 1950, was Clint McDade possessed of sufficient mental capacity to enter into a valid contract? Answer: Yes.

"(2) If your answer to Issue No. 1 is 'No' was Clint McDade's mental incapacity known to Mr. and Mrs. Neil McDade and Grace Everest McDade? (No Answer)."

## Chancellor's Final Decree

The Chancellor dismissed the cross-bill of Clint Mc-Dade seeking a rescission of the contracts and left him with all the property which he received under the several contracts dated January 14, 1950.

The Chancellor dismissed the cross-bill of Everest McDade and wife, Edith McDade, for the recovery of $5,000 paid to Honorable Raymond Witt as attorney's fees and no appeal has been taken from this action.

Also dismissed were the cross-bills of Everest McDade and wife, Edith McDade, against the Hamilton National Bank for the alleged conversion of the $28,500 Clint McDade and Sons, Inc. note. No appeal has been prosecuted from this action and therefore, it has become final.

The Chancellor sustained the prayer of the cross-bills of Everest McDade and wife, Edith McDade, seeking a rescission of their contracts for the sale of their interests in the McDade enterprises. The competency of Edith McDade to execute the contracts had not been put in issue but the Chancellor held that her contracts were intertwined and so closely connected with the contracts of Everest McDade that equity required her contracts to be set aside and that she be put in equitable status quo along with Everest McDade.

The Chancellor felt it improper to restore Edith McDade's 25% interest in Semmes Nursery and thus make her a partner with Clint McDade. Accordingly, he set a value of $65,000 on her interest in Semmes Nursery as of January 14, 1950 and made a charge of this amount against Neil McDade, Grace Everest McDade and Ruth McDade.

The Chancellor held that Everest and Edith McDade were entitled to the tax refunds in the amount of approximately $38,000.

He allowed Everest McDade the sum of $10,000 a year as salary from the McDade enterprises according to the gentlemen's agreement made in 1949.

From the final decree as entered by the Chancellor we copy in part as follows:

"* * * It appears to the Court that the proof does not sustain the issues of fraud, duress or grossly inadequate consideration as to Clint McDade and it does not sustain the plea of laches or estoppel by Neil McDade and Grace Everest McDade as to Everest and Edith McDade or to Clint McDade.

"It appears that Neil and Ruth McDade have withdrawn in salaries from Clint McDade and Sons and Southland News Company for the seven year period, 1950-1956, inclusive, $426,854.66, with Ruth McDade's salary exceeding Neil McDade's by $40,-000.00; that Grace Everest McDade was paid in salaries for the same period, $65,930.00.

"The Court further finds that Everest McDade is to be placed in the status quo of January 10, 1950, by having the proper officials of the following companies issue to him the following percentage of the presently outstanding stock:

"Southland News Company, a corporation 16%
"Southland News Company, a partnership 16%
"Pepsi-Cola Bottling Company 25%
"Clint McDade and Sons, Inc. 25%

"And that Edith McDade will be awarded $50,-000.00 in lieu of restoring her to a 25% interest in Semmes Nursery, plus $15,000.00 undistributed profits which were due her on January 10, 1950, and were withheld from her; Everest and Edith McDade will be awarded a monetary adjustment on the basis of the following accounting:

"Everest and Edith McDade are charged with the following:

| | | |
|---|---:|---:|
| "As of February 21, 1950, Everest and Edith McDade received from Neil McDade and Grace Everest McDade_____ | | $ 26,084.18 |
| "Quit claim deed to Lot 43, Rolling Way, Signal Mountain _____ | | 1,600.00 |
| "Hudson automobile _____$ | | 790.50 |
| "Refund of federal income tax and Alabama tax paid to Edith McDade to apply on Semmes Nursery _____ | | 3,597.48 |
| "Notes payable of Edith and Everest McDade and notes endorsed by them for others as of February 21, 1950 _____ | | 23,515.14 |
| "Note of Lawrence Porten (Father of Edith McDade) _____ | | 5,851.75 |
| "Refund of $750.00 per month on purchase money notes for 84 notes, including March, 1957 payment _____$63,000.00 | | |
| "Interest paid @ rate of 2½% per annum on installment payments _____ | 16,598.31 | 79,598.31 |
| | | $141,037.36 |

"Neil and Grace Everest McDade are charged with the following:

| | | |
|---|---:|---:|
| "For sale of one-fourth interest in Semmes Nursery _____$ | | 65,000.00 |
| "Note payable of Clint McDade & Sons to Everest McDade, due April 1, 1950_____ | | 28,500.00 |

"Income due Everest McDade on for-
bearance agreement, 7 years @ $10,000.00
per year _____$70,000.00
"Less—Earned income 1954 $787.20
 Earned income 1956 3,868.38

 4,655.58 65,344.42

"Value of Orchidhurst, $21,488.31,
Everest McDade, one-fourth interest
 therein _____ 5,372.08
"Dividend on one-fourth of stock, paid
1950-1956 _____ 17,684.00

 Total_____$181,900.50
"To be paid by Everest and Edith McDade
to Neil McDade for apportionment be-
tween himself, Grace Everest McDade
and/or one or more of the corporations
that may be entitled to receive same_____ 141,037.36

"For the balance of _____$ 40,863.14

"Everest and Edith McDade will have a
decree against Neil McDade and Grace
Everest McDade, after withdrawing the
tax refunds, of $40,863.14.

"Everest and Edith will be paid the tax
refunds of:

"Unendorsed checks held by the
Clerk and Master $32,895.15
"Cash held by the Clerk and Master 2,998.91

 $35,894.06

"Payment of the $40,863.14 will be made at the rate of $1,000.00 per month, to be secured by escrowing one-half of the capital stock that Neil McDade and Grace Everest McDade acquired from Clint McDade on February 21, 1950, or such other security as may be agreed upon between the parties, and will be without interest.

"It further appears to the Court that so long as Everest McDade needs it, he is to be paid $10,000.00 per year by Neil and Grace Everest McDade, less any income he earns for personal services, if he remains away from and forbears from competing with Clint McDade and Sons, Inc., and holds himself ready to advise as consultant. No present action will be taken on the following four items, provided the total of all McDade family salaries, plus $10,-000.00, does not exceed the net earnings after taxes of said corporations in any one year, and provided the payments herein specified are promptly made:

"(1) Was the sale of the assets of Southland News Company, a partnership, as a going concern, valid without the consent of Everest McDade?

"(2) By what authority did Neil McDade use Southland News Company's partnership funds for the purchase of real estate from which he personally conducts the business of Archer Paper Company?

"(3) Were corporate or partnership funds used in the purchase of Archer Paper Company?

"(4) An accounting for excess salaries, if any, withdrawn from McDade corporations by (a) Neil McDade, (b) Grace Everest McDade, (c) Ruth Clint McDade.

"Signal Nursery is not affected by this litigation.

"It is, therefore, Ordered, Adjudged and Decreed by the Court:

"1. That the original complaint against Everest and Edith McDade is dismissed.

"2. That the cross bill of Everest and Edith McDade be dismissed as to Raymond Witt and the Hamilton National Bank, and that it be sustained insofar as Neil McDade and Grace Everest McDade are concerned to the extent that they pay him the sum of $10,000.00 per year in equal monthly installments, beginning on the 1st day of April, 1957, less any amount which Everest earns for personal services; and that Neil McDade and Grace Everest McDade pay to Edith and Everest McDade the sum of $40,-863.14 at the rate of $1,000.00 a month, said payments to be secured by pledging with Robert C. McEwan, guardian ad litem, one-half of the capital stock that Neil McDade and Grace Everest McDade acquired from Clint McDade on February 21, 1950.

"3. The cross bill of Clint McDade is dismissed at his cost.

"4. The costs of the cause are adjudged against Neil McDade and Grace Everest McDade, except those costs incident to the cross bill of Clint McDade, which are adjudged against him. The Court will retain jurisdiction of the cause for the purpose of enforcing this decree and a lien is declared on the amount due Edith and Everest McDade in favor of Robert C. McEwan for his services in the matter, and a reference is hereby ordered to the Clerk and Master to determine the reasonable value of his services

to date. The Master will notify all interested parties of the time and place of a hearing to determine the amount and will report his findings to the Court.

"5. The Clerk and Master is directed to deposit the government checks now in his possession, totalling $32,895.15, by endorsing the same, if necessary, in the name of the payee and when the same have cleared the bank, to distribute the proceeds, together with the $2,998.91 remaining from the previous deposit of other government checks made according to order of this court, and to distribute the total thereof of $35,894.06 to the guardian ad litem and Edith McDade. The Clerk will also return to said guardian ad litem the proceeds of an $11,000.00 check heretofore tendered by Everest, and the Clerk will also refund to Clint McDade or his solicitor of record the funds tendered by him, and such funds heretofore tendered by the respective parties shall be withdrawn without prejudice to the rights of any party.

"6. Neil and Ruth McDade and Grace Everest McDade, as stockholders, directors and/or officers of Clint McDade and Sons, Inc., Southland News Company, Inc., Pepsi-Cola Bottling Company, Inc. and as partners of Southland News Company, a partnership, will issue or cause to be issued to Everest McDade 25% of the presently outstanding stock of Clint McDade and Sons, Inc., 16% of Southland News Company, Inc., 25% of Pepsi-Cola Bottling Company, Inc., and 16% interest in Southland News Company, a partnership, and they will deliver proper stock certificates of the corporation and any acknowledgement of the evidence of ownership in the partnership to the guardian ad litem."

## Appeal of Clint McDade

We consider first the assignments of error filed by Clint McDade to the action of the Chancellor in dismissing his cross-bill in which he sought a rescission of his contracts of sale and purchase.

Under these contracts of sale and purchase of the various interests in the McDade enterprises, Clint McDade received in exchange for all of his interests the following property:

1. Notes Receivable:

| | | |
|---|---|---|
| a. Southland News Company | $37,800.00 | |
| b. Clint McDade & Sons, Inc. | 74,400.00 | |
| c. Pepsi-Cola Bottling Co. | 14,800.00 | |
| d. Neil McDade | 10,800.00 | |
| Total notes receivable | | 137,800.00 |

2. ¾ interest in Semmes Nursery (other ¼ owned by Fannie Coflin) valued at — 166,285.96
3. Cadillac Automobile — 1,250.00
4. Boat — 908.45
5. Orchidhurst (an orchid range located in England formerly owned by Clint McDade & Sons) valued at — 21,488.31
6. Cash—paid — 61.69

Total value of property received by Clint McDade for his interest in McDade enterprises — $327,794.41

After the transfers were completed in February, 1950, Mr. Clint McDade moved to Mobile, Alabama, from Chattanooga, Tennessee. In May, 1950, he purchased from

Mrs. Fannie Coflin the other ¼ interest in Semmes Nursery giving him 100% ownership. He paid Mrs. Coflin the sum of $60,000 for her ¼ interest. Later he incorporated Semmes Nursery and at the time of the trial owned all of the stocks except two shares of small par value which were apparently held by others for organizational purposes only.

Apparently the operation of Semmes Nursery by Clint McDade as the sole owner has not been too successful. The record shows that he went back into the orchid business in Mobile but the venture has never been profitable.

At the time of the last trial in January 1957, Mr. McDade had collected over $100,000 in principal payments together with all accrued interest on the promissory notes which he received in settlement under said contracts for the sale of his interests in McDade enterprises.

By assignment of error No. 1 Mr. McDade insists that there is no evidence to support the decree of the Chancellor under the facts and law of the case. We defer discussion of this assignment until later in this opinion.

Assignments of error 2 and 3 are as follows:

"Assignment of Error No. 2:

"The Court erred in refusing to submit Issue No. 1 to the jury as follows:

" 'Was the sale by Everest and Edith McDade of their interest in the various McDade enterprises brought about by fraud, duress or undue influence on the part of any member or members of the McDade family?

"The Court erred in treating the trial of this case by a jury in an advisory capacity, and therefore

withdrawing the above issue, and the cross-complainant, Clint McDade, was entitled to a jury trial as a matter of law, and that issue should have been submitted.

"Assignment of Error No. 3:

"The Court erred in refusing to submit Issue No. 2 to the jury as follows:

" 'The second issue that you will determine is: Were the agreements of January 14th, 1950 and February the 10th, 1950, executed by Everest Mc-Dade and Edith McDade for a grossly inadequate consideration?

\* \* \* \* \* \*

" 'Now those same issues will be submitted to you for Mr. Clint McDade.'

"The Court erred in treating the trial of this case by a jury in an advisory capacity, and therefore withdrawing the above issue, and the cross-complainant, Clint McDade, was entitled to a jury trial as a matter of law, and that issue should have been submitted.''

 It will be remembered that on April 1, 1954, an order was entered by the Chancellor disallowing the demand for a jury trial made by Everest, Edith and Clint McDade to which action they all excepted and prayed an appeal. At that time the appeal was denied by the Chancellor. (Tr. Tech. Record, Vol. II, page 272)

When this cause was brought to this court upon a broad appeal Everest and Edith McDade made no assignments of error. Clint McDade has not made an

assignment of error attacking the action of the Chancery Court of date April 1, 1954, disallowing his demand for a jury trial. Accordingly, that action of the Chancellor has become final.

The jury which was later empaneled by the Chancellor in the present cause was an advisory jury only. The right of the Chancellor to empanel such a jury is thoroughly established in the law of our state.

From Gibson's Suits in Chancery, 5th Edition, page 647, section 596, we quote as follows:

"Sec. 596. May Chancellor Impanel Jury Of His Own Motion?—From time immemorial the Chancellor has claimed and exercised the right to call a jury to his aid of his own motion whenever he is concerned about the disputed issues of fact. This power so to do is not now questioned. It is to be exercised by the Chancellor at his discretion as to submission of issues and formulation of them and the method of trial. Nor is there doubt that a Chancellor may take the advice of the jury as to any material issue of fact, determinative or incidental.

\* \* \* \* \* \*

"The Chancellor may impanel a jury before entering upon a regular hearing or he may do so at the hearing, or in its midst, or at its conclusion. It is his province to formulate the issues to be submitted and to prescribe the way in which the jury hearing is to be conducted. He may direct the readings of the depositions without any oral testimony, or he may confine the trial to oral evidence only, or he may admit both species of testimony.

"While this method of determining issues rests wholly within the discretion of the Chancellor and is to be treated as his own act, a Solicitor is well within his rights in suggesting at any stage of the hearing that a jury be impanelled to pass upon or decide matters of fact.

"The Chancellor is in a sense bound to accept and act upon the verdict of a jury to whom he has of his own motion submitted some matters of fact. The opinion of the jurors is still, however, wholly advisory. He may reject it entirely or he may adopt it in toto; or he may abide the conclusions of the jury as to some points and disregard it as to others and find the facts for himself. It is for the Chancellor to determine to what extent he will make use of the verdict in forming his decree. * * *"

Hence we hold that it was discretionery with the Chancellor as to what issues he would submit to the advisory jury and he cannot be put in error for failing to submit the issues of fact set out in the assignments of error 2 and 3 of Clint McDade. Therefore, these assignments of error 2 and 3 are respectfully overruled.

Assignment of error No. 10 insists that appellant, Clint McDade, is entitled to a new trial because the Chancellor failed to pass upon or consider the motion for a new trial filed by him. At page *747 of Volume IV* of the technical record we find an order of the Chancery Court enrolled of date May 25, 1957, expressly overruling Clint McDade's motion for a new trial on all grounds. To this action Clint McDade excepted, prayed and was granted an appeal. Hence, assignment of error No. 10 is without merit and must be overruled.

■ We now consider assignment of error No. 1 to the effect that there is no evidence to support the finding and decree of the Chancellor.

The record shows that Clint McDade is a man of unusual talents and business ability. He was 64 years of age at the time of the trial in 1957.

He had been adjudged a bankrupt in the early 1930's and discharged of his debts. However, he got a new start and with the advent of better economic conditions began to prosper. After he "got on his feet" so to speak, he paid in full all of the debts which had been discharged in bankruptcy. The Chancellor found him to be a man of honor, integrity and high principle.

From 1932 to 1950 Mr. McDade appears to have worked long and hard, and steadily but surely enlarged his holdings and increased his business interests until he felt that he was worth approximately a million dollars sometime around 1945 or 1946.

Mr. McDade was generous with the members of his family and gave and sold them interests in the several businesses from time to time. He kept full control of each of the businesses and often required the members of his family and his in-laws to pay most of their incomes from the business towards the purchase price or to plow back their profits in the business; allowing them to draw only enough to pay income taxes. None of the McDade enterprises paid dividends as such. Instead Mr. McDade paid himself and the other owners profits in the form of salaries only; primarily for income tax purposes.

In 1946 Mr. Clint McDade began consulting psychiatrists. That he was very emotional and became somewhat unstable at times is not questioned. Oftentimes he

had crying spells. He sometimes carried a large doll around with him; sometimes taking the doll to the office and sitting it on his desk and talking to it. Several members of his family including his father and mother had committed suicide.

Mr. McDade was concerned and very much disturbed over his mental condition. The Chancellor found that he had spent thousands and thousands of dollars on psychiatric treatment and consultations.

The proof shows that in 1951 Mr. McDade sought relief in a new field of psychotherapy called dianetics. A Mr. Johnathan Koontz who was a practitioner in this field and who had treated Mr. McDade, testified as a witness for him.

Mr. Koontz is a man of splendid educational background having received a Master's Degree in music from Columbia University. His education and training in the field of dianetics is much more limited. He first read a book by a man named Hubbard concerning the practice of dianetics. Later Mr. Koontz enrolled in Mr. Hubbard's school of dianetics at Elizabeth, New Jersey. Mr. Koontz completed the course in four weeks and then began active practice. A practitioner of dianetics is called an auditor and Mr. Koontz was employed by Mr. McDade to audit him.

The plan of treatment requires the auditor to move in with the patient and live with him almost constantly talking to and listening to the patient as much as possible encouraging the patient to tell as much about his early life and particularly about matters that might be the source of his emotional disturbance. Mr. Koontz lived in the hotel with Mr. McDade for several months

and travelled about the country with him at a salary of $800 per month. In addition, Mrs. Koontz was employed as a secretary to Mr. McDade.

Mr. Koontz testified that it was his expert opinion that Mr. McDade was emotionally unstable insofar as members of his family were concerned; that he had a deep-seated hatred or resentment against them and was unable to exercise ordinary reasonable judgment in transactions with them.

It will be remembered that Mr. Clint McDade, under the contracts of date January, 1950, became the owner of ¾ interest in Semmes Nursery in Mobile, Alabama. Shortly thereafter he purchased the ¼ interest of Fannie Coflin for $60,000 making him the full owner. At the time of the trial Semmes Nursery did not appear to be making much profit. The primary reason appeared to be that Mr. McDade went into the orchid business without adequate personnel to handle such a business.

Two reputable and qualified psyciatrists who had treated Mr. McDade testified as witnesses in his behalf. There isn't any doubt from their testimony and from other testimony in the record that Mr. McDade is a very nervous and emotional person.

There was competent testimony from which the jury and the Chancellor could have found that Mr. McDade was not mentally competent to make a valid contract in January and February, 1950. However, they did not so find but found to the contrary.

Since the verdict of the jury was advisory only, we review the record under T. C. A. Section 27-303 and not under T. C. A. Section 27-302. The case is reviewed de

novo and we must reverse if the evidence preponderates against the finding of the Chancellor.

It would unduly prolong this long opinion to discuss at length all of the evidence in the record concerning the mental capacity of Mr. McDade. However, these facts do stand out:

Up until the sale by him of his interests in 1950, he was in almost complete charge of all of the businesses and handled all of the financial transactions. After the sale he went to Mobile, Alabama, and ran Semmes Nursery personally. He bought the remaining ¼ interest of Mrs. Coflin for $60,000.

Two letters written by Mr. McDade are very convincing to us that he was fully capable of making a contract to sell his interests in the businesses.

The first is a letter written by Mr. McDade on August 30, 1949, to Mrs. Fannie Coflin, the owner of the ¼ interest in the Semmes Nursery at Mobile, Alabama. It will be remembered that the breach between Mr. McDade and Everest and Edith has already occurred. From page 1411 of Volume VIII of the Bill of Exceptions we quote said letter as follows:

"August 30, 1949.

"Dear Mrs. Coflin:

"For some time I have been thinking about suggesting that you sell your interest in the nursery provided you could get a fair price for it. The time to sell a business is when it is going well. You have made more than 200 percent on your investment.

"As you undoubtedly know, we have had considerable trouble in our family as to what constitutes the

proper manner in which to run our businesses. We have also quarreled about what constitutes a fair division of the profits.

"Mr. Coflin was far more conscious of the disasters that come to all our businesses including the nursery through our family troubles than I was. During the last two years of his life he made me promise again and again to manage the nursery without interference from my family. I gave him the assurance that I would do so altogether too lightly.

"Everest has already asked me for the return of Edith's power of attorney stating that he did so at Edith's request. This I have refused to do, but I don't know when they may become so insistent that I will have to yield. If and when this does happen, I fear that the failure of the nursery will be only a matter of weeks away, certainly not more than a matter of months. If Everest should follow his usual pattern, he will immediately enter into a series of disagreements with our manager at the Semmes Nursery and we will lose our manager or worse still the manager will lose interest in the business and continue to draw a salary and look to the partners for his pay and for the expenses of running the nursery.

"You are one of four partners in the business and the only one who has any assets. Your partners are quite willing to share in the profits but you will have to take the losses alone. In the event of controversy, such as we have had in some of our other businesses, the nursery could easily begin to lose money at the rate of hundred fifty thousand to two hundred

thousand dollars a year. Just a few months of this sort of thing could pile up liabilities against you to the point where you would lose everything in the world you have except your property which is exempt under the laws of Tennessee.

"I have felt that I owed it to you to tell you about this for a long time, but I have been hoping against hope that things would change in our family. This morning word came to me that Everest and his attorney are preparing to sue me and the orchid business for a large sum of money. Much as I regret to tell you, I feel that in justice to the memory of my former associate, your deceased husband, I can no longer remain silent.

"If you do decide to sell, I hope you will do so quickly as the lawyers say time is of the essence. I say this for several reasons.

"First, Mr. Elwood Stephens, our present manager, is prepared to buy your interest. If our family troubles should break out in the nursery business, I assure you he wouldn't accept an interest as a gift.

"Second, the camelia and azalea business has expanded too much. There are 60 such enterprises in the Mobile area alone and thousands of them all over the sections where these plants will grow. There are enough plants coming on in the Mobile area alone that given three years growth would fill every yard in the section where they will grow. I think one more year of prosperity is all we can count on.

"Four years ago we were offered $300,000 for our Pepsi-Cola plant. It was then free of debt. Now we are trying to get someone to take it over without any payment, merely assuming a portion of the indebtedness.

"I believe our orchid business could have been liquidated for one million two years ago. Today it might conceivably pay off the indebtedness, but certainly there would be nothing left for the stockholders. Two years ago our orchid business was making $20,000 a month. It is currently losing $7,000. That is how quickly things can change.

"Third, Elwood Stephens, our manager, who has a contract and is on the ground, will be in a far better position to protect himself in case of trouble than you would be. At least he won't lose his manager unless he chooses to lose him, and that is the first thing that would happen to you.

"Fourth, our year ends as of August 31. It is a good time to make any changes that are to be made immediately.

"Fifth, this year I charged $5,000 for running the nursery as I have had very little income from other sources. Previously I had charged only $2500 for the four years or about $600 a year. I expect to go on charging a reasonable amount for running it so long as it is making a profit.

"At the time Mr. Coflin put his money into the nursery I never expected to make any charge against him as I thought the Southland News would always supply me with all the money I might need to live on.

"I suggest that you consult your banker and attorney immediately and let me have your decision. I feel that you will not have so favorable an opportunity again during my lifetime. My best regards to you and Virginia."

The other is a letter written by Mr. McDade shortly after the transactions of January, 1950, had been completed. This letter was written by Mr. McDade to his former brother-in-law, Harvey Everest, in Oklahoma City. It is dated January 20, 1950, the same day the contracts to sell and buy the various interests in McDade enterprises were signed.

The original letter was not produced but Mr. Neil McDade testified that his father had sent him a copy of the letter.

From page 1751 et seq. of Volume IX of the Bill of Exceptions we copy the letter in full:

"Dear Harvey:

"At long last I think we have come to a possible solution to our various family difficulties.

"During the past six months Everest has been coming around the greenhouses on weekends and at nights stealing records from the place and otherwise disrupting us until it has been almost impossible to do business.

"Our grower recently resigned because of his activities and we knew it would be next to impossible to get another grower under present conditions as we got a bad enough reputation when Everest broke faith with the Lines, who are undoubtedly the world's

best orchid growers. When they left we approached several growers and offered them up to two and three times as much as they were making but when they checked with the Lines, each one refused to consider any offer from us. We only got our present grower through our English manager, who had known him from boyhood and who assured the present grower that things would be better in the future.

"About two months ago Everest went to Mobile and began to make trouble with the manager down there. Edith served notice on me that she was withdrawing her proxy to allow me to manage her interest in the nursery for her. Naturally if I could not manager hers I would not be in position to manage for the other three partners—Grace, Ruth and Mrs. Coflin. The nursery has been the one principal business in which I have not had much interference and which is still making good money, though it does not have anything like the potentialities that the orchid business has. I figure the orchid business has a value of $1,500,000.00 and if it could be run without any interference, it could be made to pay out on that basis. We are streamlining it to admit tourists and charge admission. I think this feature alone will net $50,000.00 to $100,000.00 a year as soon as it gets going good.

"Unfortunately we have had nothing but turmoil for the past four years and I have had to borrow most of the cash value of my insurance and lend it to the businesses instead of devoting my energies to money making.

"Edith still owes me and the old Southland News Company partnership part of the money that I advanced her to pay her interest in the nursery and to buy one-half interest in her father's business. When she withdrew her nursery proxy I decided to sue Edith on her notes and take away her interest in the nursery and to sue the orchid business for about $100,000.00 that I had borrowed personally and loaned to it, and thus get rid of Everest's stock interest by buying in the orchid business at a forced sale. The other members of the family were not willing to have me do this, so we finally arrived at this decision:

"I am turning over to Neil and Grace, all of my interest in the orchid business, the Southland News Company, the Pepsi-Cola Bottling Company and the old Southland News Company partnership which still has about $50,000.00 in undistributed assets. Neil and Grace are turning over their interest in the Mobile nursery to me and they are going to secure the money that the orchid business owes me, with a mortgage on the fixed assets of the orchid business and some stock in our companies to be paid at the rate of $7,000.00 a year over a period of twenty years.

"I am assuming about $25,000.00 of the tax liabilities. Grace and Neil are assuming about $75,000.00. We believe we can beat the case.

"I am going to distribute the quick assets of the nursery to the partners to enable them to pay their taxes and to enable Neil and Grace to make a down payment to Everest for his interest in the various

businesses. They are paying him $150,000.00 over a period of ten years and relieving him from his tax liabilities of more than $25,000.00. With the money Everest has already received, this will mean that he is going to end up having received a net of about $225,000.00 of our assets above taxes and his theoretical earnings.

"On the other hand, Dorothy has received about $17,000.00. I felt that I could not go along on such a program, hence our decision to separate. I feel sure that Everest's destructive and obstructive activities have cost us a minimum of $500,000.00 in earnings over the past four years and that we will not recover from the damage he has done to our reputation and good will in my lifetime.

"I will have to borrow about $65,000.00 to be able to distribute the quick assets of the nursery and operate through the next growing season. If I have three good years and my taxes are not too heavy, I can probably get the loan down to a point where I can make it through the bad years that are not far away.

"The nursery industry has had fifteen years of prosperity, which is the longest time on record that the nursery business, as a whole, has ever been continuously profitable, so it looks as though it is due for a slump pretty soon. I will own 75 per cent and Mrs. Coflin will own 25 per cent. Everest got Mrs. Coflin all stirred up by telling her that I was being dishonest with the partners and dissipating the assets. She and Edith had a partners meeting at Mrs. Coflin's house to protest my bad management. Grace and

Ruth stood by me loyally and our controller, Atlee Bird, attended to certify that I had not misused the funds of the business as Everest claimed. Mrs. Coflin made many bitter and unjust accusations against me which will be difficult for me to forgive. I would feel much better if I could buy Mrs. Coflin out, but that just doesn't seem possible under the circumstances.

"I still have about $100,000.00 straight life insurance which has not been pledged. I am going to turn this over to Grace and use part of the cash she gets out of the nursery to make some additional premium payments and take out paid up insurance for the net value. I am, of course, giving Grace my share of the house.

"I will include in the amount I borrow at the Mobile bank enough money to send you or Mother the regular amount I am sending her for a year in advance.

"In view of the tremendous issues involved, I suppose it will seem silly to you to hear me say that I regret that it had to happen just at this time because of a very minor matter affecting my vanity. My withdrawal from my larger interests will undoubtedly prevent me from making the next issue of Who's Who. I have already been written up in the monthly supplement to Who's Who. I was included in the new book published by the same firm, A. N. Marquis Company, 'Who Knows—And What' and I will be included in the next issue of Who's Who In Commerce And Industry, also published by the same firm. I am reasonably certain that I am scheduled

for the next edition of the main book. Since I have conducted myself in such a manner as to lose the love and respect of my family, these little matters affecting my vanity were about all I had left.

"It seems a sad state to come at this time of life but I think that we have all been through such misery during the past four years that this solution, bad as it is, will be much better than the hell we have been going through since Everest got back from the Army. I have built up a good reputation which is truly world wide in scope and I regret giving it up to start over again at my age. I am truly sorry for Grace. However, nothing could possibly be as bad as to continue in our present atmosphere of bitter family strife. She is the loveliest and sweetest woman I have known or ever will know. She has been especially thoughtful of me during the three very difficult months we have just gone through.

"Sincerely,"

Mr. Clint McDade was represented in the transactions of sale and purchase by his long-time attorney and friend, Honorable Paul Campbell of Chattanooga.

Mr. Homer Hardy, a Certified Public Accountant, testified that he was consulted first in 1949 by Everest McDade who contended that he was not being treated properly. Later Mr. Hardy consulted with Neil McDade; Clint McDade; Clint McDade's lawyer, Paul Campbell; Raymond Witt, attorney for Everest, and possibly others.

Mr. Hardy testified that he made the computation of the values of the various McDade enterprises for the

sales and transfers by the several owners partially upon estimates furnished by Clint McDade. He also produced in evidence a memorandum delivered by Clint McDade to him entitled "Binding 60 day option from Clint McDade to Neil McDade Agent." (Bill of Exceptions— Exhibits File—Complainant's Exhibit No. 14)

This memorandum gave a list of the assets to be sold to Neil McDade, agent, and the assets which were to be received by Clint McDade, namely, 75% of Semmes Nursery and $140,000 in notes to be secured by a mortgage on the assets of the businesses sold. The sales and purchase agreements as finally completed between Neil McDade, agent, and Clint McDade very closely followed the contents of the memorandum submitted by Clint McDade.

Therefore, not only do we not find that the evidence preponderates against the finding of the Chancellor as to the competency of Clint McDade but we find that it preponderates in favor of the finding by the Chancellor that Clint McDade was possessed of sufficient mental capacity not only to make *a* contract in January, 1950, in which finding we concur. We also find from the evidence that Clint McDade was fully mentally competent to make *the* particular contracts sought to be rescinded in the present case. Therefore, assignment of error No. 1 is respectfully overruled.

Assignment of error No. 6 is as follows:

"The Chancellor erred in repeating many times in the presence of the jury that the issue was not whether Clint McDade was competent to enter into these particular contracts with members of his family, but simply whether he was competent to enter

into a contract, and thus Clint McDade was deprived of proving and having submitted to the jury the real issue of whether or not he was mentally competent in entering into the very contracts involved in this litigation.''

We are constrained to overrule this assignment of error because we are not cited to any place in the transcript where the Chancellor is alleged to have made the statement set out in the assignment. (See Rules of Court of Appeal, Rule 11, Sub-Sections (1), (2) and (3).)

With such a large record of 3,900 pages, observance of this rule is most important.

Assignments of error 7, 8 and 9 are as follows:

Assignment Of Error No. 7:

''The Chancellor erred in refusing to rescind the entire contract after holding that Neil McDade was guilty of fraud, and Everest McDade was mentally incompetent.

''Assignment Of Error No. 8:

''The Chancellor erred in holding that he would have set aside the entire contract except for Clint McDade's incapacities, so that in effect the Court refused to grant relief to an incompetent person because he was incompetent, and would have granted relief had Clint McDade been competent.

''There is no justification in equity for better treatment of a competent person than one who is incompetent.

"Assignment Of Error No. 9:

"It was error for the Court to set aside portions of the contract without setting aside the entire contract, because all of the contracts were so closely interwoven that it would be manifestly improper for the Court to select portions of the contract for rescission and other portions of the contract to be executed and performed."

From the Chancellor's memorandum opinion we quote as follows:

"The jury found that Neil McDade and Grace Everest McDade knew that Everest McDade was of unsound mind in January and February, 1950. Neil McDade and Grace Everest McDade knew that Everest McDade's income was to be cut off as of January 1, 1950, that telegrams were sent demanding payment on demand notes, a thing unheard of in the family during previous years, that Edith McDade, contrary to an established practice, was denied the right to withdraw part of her $15,000.00 share of undistributed profits in Semmes Nursery to be used to meet the January 15, 1950 tax payment, and they participated in and had full knowledge of what transpired at the December, 1948 and 1949 meetings of Clint McDade & Sons, Inc., which were attended by Everest McDade. Knowledge of the existing facts and circumstances, coupled with the jury's findings, imputes to Neil McDade and Grace Everest McDade fraud and bad faith as a matter of law.

"The contracts of January 14, 1950, February 21 and February 22, 1950 between Neil McDade, for

534

himself and as agent for Grace Everest McDade, and Everest McDade, are set aside.

" 'A contract with an insane person, by one having knowledge of his incapacity, may be set aside on the ground of fraud.

" 'Knowledge or information such as would lead a prudent person to believe that the other party to a contract is of unsound mind is such evidence of bad faith as will avoid the contract.' Pritchett v. [Thomas] Plater & Co., 144 Tenn. [406], 407, [232 S. W. 961], Headnotes 6 and 7.

"See also 17 C. J. S. Contracts, sec. 418.

"The contract of sale having been set aside as to Everest McDade, it cannot be enforced against Edith McDade for the obvious reason that she joined Everest McDade in selling both her and his holdings in the McDade enterprises for the lump sum of $150,-000.00 without stipulating what part of the purchase money was being paid for her undivided one-fourth interest in Semmes Nursery. The contract, not being divisible, must, therefore, be set aside in toto.

" 'An entire contract, in its legal interpretation, is an unconditional agreement for the whole of the several articles, or number of quantity of goods and chattels, contracted for, and precludes by its terms, and equally by the plain intention of the parties, all idea of divisibility or apportionment.' Coleman v. Hudson, 34 Tenn. 462 [463]; Barnes Bros. v. [Black Diamond] Coal Co., 101 Tenn. 354 [47 S. W. 498]; Brockett v. Pipkin, 25 Tenn. App. 1, 149 S. W. (2d) 478.

"The book value placed on Edith McDade's one-fourth interest in Semmes Nursery by Neil McDade was $45,000.00 plus $15,000.00 in earned but undistributed profits at the time of sale. This same figure was used in selling Edith McDade's interest in Semmes Nursery to Clint McDade. Two or three months later Clint McDade purchased Fannie Coflin's one-fourth interest in Semmes Nursery for $60,000.00 after she had received $15,000.00 in undistributed profits. Clint McDade thereby became sole owner of Semmes Nursery.

" 'A court of equity, in decreeing rescission or cancellation of a contract, applies general rule that when a court of equity obtains jurisdiction, it will proceed to administer full equity, and adjust the rights of all the parties and give complete relief.' Baird v. McDaniel Printing Co. [25 Tenn. App. 144], 153 S. W. (2d) 135, 136.

"Clint McDade, as a result of a contract that has been set aside only as to Everest and Edith McDade, acquired through that contract the orchid nursery, Orchidhurst, in England and Edith McDade's one-fourth interest in Semmes Nursery. To pursue the law strictly would require that the contracts with Clint McDade be set aside so as to make possible a restoration of all interests as they stood on January 14, 1950. A Court of Equity may consider the intent and purpose and look to the substance of every transaction, regardless of the form, and disregard ceremonies in an effort to do justice as between the parties. If there is substance which the Court may act upon in dealing with equities between the parties,

it will not allow form to defeat the right to relief on facts alleged and proved. Equity regards that as done which ought to have been done. Whenever good reason and good conscience require the doing, the undoing or refraining from doing that which affects another's property or rights, the Chancery Court may proceed by decree to protect a party who has an equitable right.

"If the contracts between Clint McDade and Neil McDade and Grace Everest McDade are set aside, in order to place all of the parties in status quo, that would settle nothing and would be placing the parties right back where they were before all the trouble started. The discord that would result from an intensified family feud and a struggle for control of the businesses between Clint, on the one hand, and Neil McDade and Grace Everest McDade, on the other, could easily be the means of destroying that which they would be fighting to get control over, to the detriment of all members of the family. It becomes the duty of the Court to protect the interest of the incompetent from being wasted. If Clint McDade's contract should be set aside, on the authority of Baird v. McDaniel Printing Co. [25 Tenn. App. 147], 153 S. W. (2d) [135], 136, he would be entitled to be reinstated to the offices he held in the corporations at the time of the sale and to recover his accumulated back salary from the date of the filing of his cross-bill, less the salary earned in Semmes Nursery during that period. Such a ruling would be manifestly inequitable and would jeopardize the property rights of all of the parties. It would be recognizing a wrong without providing a remedy.

"Neil McDade's and Grace Everest McDade's salaries would have to be reviewed and possibly disallowed in whole or in part. It was the family arguments that could have caused a jury to hold a price of $150,000.00 for Everest and Edith McDade's interests not to be grossly inadequate.

"Notwithstanding the jury's finding that Clint McDade was fully capable of handling his business affairs in January and February of 1950, the Court is convinced that Clint McDade is not presently capable of successfully handling the involved business affairs of the McDade enterprises. It would be disastrous to restore control to him, and it would be unconscionable to have Clint McDade be second in command and take orders from his son, Neil McDade. Clint McDade's supervision of Semmes Nursery, after becoming sole owner, is a record of bad supervision. The business suffered substantial losses because he ordered thousands of dollars of orchid plants to be grown and propagated in an azalea and camellia nursery and then made no provision for the handling of these orchid plants, which required special care and the attention of one skilled in the growing of orchids.

"The Court concurs in the jury finding that in January and February of 1950 Clint McDade fully understood the contracts he entered into with the family. The issue of mental capacity was the controlling issue as to Clint McDade. The Chancellor may not disregard or wholly nullify the verdict of the jury upon the material and controlling issues. Gibson, 5th Edition, Sec. 588."

538

■ Since this Court has concurred in the finding of the Chancellor that Clint McDade was mentally competent to make a contract on January 14, 1950, and that he is not entitled to have his contracts rescinded, Clint McDade is not in a position to question the action of the Chancellor in not rescinding all of the contracts. His rights are not adversely affected by such decision legally. Hence, these assignments of error are respectfully overruled.

■ Assignments of error 4 and 5 complain that the Chancellor excluded, upon objection, the answers of the two psychiatrists, witnesses for Clint McDade, to the following question:

"Q. What was Mr. McDade's mental condition with respect to the business transactions with his family?"

The contention of Mr. Clint McDade all the way through the trial was that he was mentally competent to do business with other people but that he had become so embittered toward members of his family that he could not exercise sound judgment where they were concerned and that for this reason he was mentally incompetent to do business with them.

In our opinion, His Honor the Chancellor was in error in failing to permit these psychiatrists to give their expert opinion on this question for whatever probative value such opinions may have had.

The writer of this opinion as one of the attorneys in the case of Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 181 S. W. (2d) 369, was able to convince a jury and the trial judge that the testator bore such enmity or

hatred toward certain members of his family that his reason became dethroned insofar as they were concerned and that he was thereby rendered incapable of making a valid will. However, we were unable to convince the Court of Appeals and the judgment of the lower court was set aside and reversed.

"Although it was at one time considered that a person afflicted only with an insane delusion, or insanity on some particular subject, was not capable of performing any civil act requiring volition, it is now well understood that a man may be thoroughly insane on one subject and at the same time be quite capable of transacting business on all others; and to avoid a man's act on the ground of insane delusion, it is necessary to show that the act under judicial consideration was the direct result of such delusion. However, a person may avoid a contract entered into by him when laboring under monomania or an insane delusion, although in other respects sane, provided the delusion is so connected with the subject matter of the contract as to render him incapable of understanding its nature and probable consequences. Indeed, it has been held that, if one who understood, in the ordinary sense of the word, the nature and effect of a contract, yet if he was impelled by an insane delusion to enter into it, when but for the delusion he would not have done so, the contract may be avoided." 32 C. J., Sec. 499, p. 729, See also 44 C. J. S. Insane Persons sec. 98.

We agree with solicitor for appellant, Clint McDade, that the issue to be decided by the Chancellor was whether Clint McDade was mentally competent to make the

particular contracts in question on January 14, 1950, and not just competent to make any contract on said date.

On this issue the evidence offered by the psychiatrists should have been admitted and His Honor the Chancellor was in error in excluding it. However, this Court has considered the evidence erroneously excluded by the Chancellor and has found Clint McDade competent to make the particular contracts sought to be rescinded in this case. Hence, the error in excluding said evidence is not reversible. T. C. A. Section 27-116, 117.

Also we think a reasonable construction of the Chancellor's decree in the light of his statements as found in the record supports a conclusion that the Chancellor did find as a fact that Clint McDade was mentally competent to make the particular contracts in question of date January 14, 1950, and February 22, 1950. In this finding we have concurred as above set out.

It follows that the judgment of the Chancellor insofar as the appeal of Clint McDade is concerned is affirmed and he is taxed with the costs of this appeal.

Appeal by Neil McDade, Ruth McDade, Grace Everest McDade, Dorothy McDade Ferguson, Southland News Company, A Partnership, Southland News Company, Inc., Clint McDade & Sons and Pepsi-Cola Bottling Company of Chattanooga.

■ We now consider the sixteen assignments of error made on behalf of the appellants named immediately above. Assignment of error No. I is as follows:

"That the Court erred in submitting the issues heretofore set forth pertaining to Everest McDade

to the advisory jury because there was no material dispute in the evidence, the evidence introduced at the trial pertaining to these issues was so intermingled with other evidence on other questions of law and facts retained by the Chancellor that the jury could not separate this evidence from the evidence pertaining to particular issues submitted to it, and, therefore, were not in a position to render a verdict that would aid the Chancellor in determining the lawsuit.''

█ In our opinion the issues of fact which were submitted to the advisory jury by the Chancellor were material; they were supported by competent evidence and we hold that the Chancellor was not in error in submitting them to an advisory jury. Hence, this assignment of error is respectfully overruled.

Assignments of error II, III, and IV are as follows:

''II.

''That the Court erred in finding and entering a decree that Everest McDade lacked sufficient mental capacity to execute the contract on January 14, 1950 because there was no evidence to sustain such finding either by the Chancellor or the advisory jury since the evidence on this issue preponderated against such finding of the Chancellor and the advisory jury.

''III.

''That the Chancellor erred in not withdrawing all issues from the advisory jury because there was no material evidence in dispute on the issues submitted

to the jury and in this particular case the issues fell within the inherent jurisdiction of the Chancery Court.

## "IV.

"There was no evidence to support the verdict of the advisory jury to the effect that Everest McDade lacked mental competency because the evidence preponderated against such a holding."

Space does not permit us to outline at length herein all of the evidence relating to the mental capacity of Everest McDade. The proof shows that while Everest McDade was in the Army in World War II he developed an allergy to wool uniforms requiring all such uniforms to have a special lining of cotton to avoid the effects of the allergy.

Upon his return from World War II, he became President of Clint McDade & Sons. In 1946 he began consulting Dr. Joe Johnson, M. D., of Chattanooga, Tennessee, for nervousness, tension, etcetera. Dr. Johnson devotes over 50% of his practice to psychiatric cases. He observed and treated Everest regularly for some nine or ten years as a psychiatric patient. From time to time Everest was hospitalized. In 1955 he was sent by Dr. Johnson to the Highlands Hospital in Asheville, North Carolina, a psychiatric hospital.

Everest spent several months in this hospital as an inpatient. He found employment as engineer for the International Resistance Company but he has continued as an out-patient of the Highland Park Hospital.

His wife, Edith, testified that Everest regularly took some sort of drugs or pills to calm himself; that he quarrelled often with his father, Clint McDade; that sometimes Everest would go into trances in which he would not know who she was; that often she would have to have the doctor to give him shots to relieve his pain and bring him out of them. Further, she testified that sometimes during these spells he would go into his room and stay two days without speaking to her or the children. These spells happened during the three years preceding the execution of the contracts of date January 14, 1950, and February 22, 1950.

Mrs. Ben Addie Perry, former employee of Clint McDade & Sons, testified that when Everest and his father quarrelled, Everest would make threats against her, his father and anyone who might have been involved in the controversy.

Mrs. F. B. Taylor, a former employee of Clint McDade & Sons, testified that both Clint McDade and Everest McDade were upset; that Everest was emotionally disturbed a great deal of the time she worked with him; that her work with him was made difficult because oftentimes Everest was not present mentally; that he was often depressed. Further, she asked not to be required to elaborate further on the quarrels of Everest and Clint McDade because she felt very kindly toward both of them and also toward Grace Everest McDade.

Dr. Joe Johnson testified that Everest was mentally ill and suffered from an "obsessive compulsive neurosis." From Dr. Johnson's direct examination we quote as follows:

"Q. Will you please state your professional qualifications, your education and your length of practice? A. I took my M. D. degree at Harvard in 1937. I spent one year at the Presbyterian School of Pathology, two years in internal medicine at Bellevue, one year at the Neurological Institute in neurology, then I came to Chattanooga to practice in January of 1942, practiced here six months, went in the Army, served as Chief of Psychiatrics at Vanderbilt University, returned to Chattanooga, opened my office again in '46 in January and have been in private practice here since.

"Q. What has your specialty been, Doctor? A. My boards of specialty, recognized boards are the American Board of Internal Medicine, about 50 to 60 per cent of my referred work from other doctors is in psychiatry.

"Q. Dr. Johnson, have you treated Mr. Everest McDade? A. Mr. McDade came to me as a patient in January of 1946.

"Q. Will you describe Mr. McDade's difficulties at the time you first started to treat him? A. His initial complaint was sensitivity to wool. This was a longstanding sensitivity, considered to be allergy. It necessitated a great deal of ritualistic behavior, he had to line his woolen clothes with cotton, he had to wear cottons in the Army. It was fortunate that he was in the South Pacific much of the time where he wore cotton. Where he had to wear woolen uniforms he had a very difficult time in getting cotton under the wool. It became apparent as we developed the background the wool allergy and sensitivity to dry-

ness and the ritualistic requirement of water and moisture that this particular illness was a reflection of an illness that I think is best described as an obsessive compulsion mechanism. Now, this simply means something we all have at times, certain amount of preoccupation with a behavior pattern. If we talk about a compulsion or have thoughts, if we talk about the obsession, that would be the general nature of the illness.

"I saw him over the next, oh, eight—it has been really almost ten years, I saw him regular. I spent some 300 hours there, 300 to 350 hours.

"Q. I think you said that all of us have these symptoms to some extent, Doctor. I will ask you whether Everest had them to an unusual or abnormal extent? A. I would say to a very unusual extent, Mr. McEwan.

"Q. During the year 1949 he continued under your care, did he not, Doctor? A. Yes, sir, I saw him intermittently during all of these years, sometimes once a week for several weeks, sometimes once a month.

"Q. Will you describe what his typical reaction was to situations that were unpleasant to him? A. Oh, that would vary, sir. We all have unpleasant situations in life. Some of them I thought he handled extraordinarily well, some of them I felt he had a great deal of tension and preoccupation with the particular unpleasant situation. I think you would have to be a bit more specific in asking me how he handled unpleasant situations.

"Q. Were there any particular types of situations that were unpleasant to Everest? A. Yes, I think that situations in which he tangled primarily with various members of his family, and I would like to say in all fairness, I have to clarify my point, I had the privilege of knowing all these members of the McDade family, sometimes they have come to me as patients and I have referred them to other physicians.

"Q. Why is that, Doctor? A. Well, I think they wanted to help Everest and I think they needed some help themselves, at any rate, I think all of them agreed, I believe to it, I don't want to make a general statement about the whole tribal pattern, but certainly many of them turned to other physicians for help, I think in fairness to them and to Mr. McDade that it was within this family pattern that pressure was most liable to be manifest in what we could call an explosive fashion.

"Q. Did you see the reaction of that pressure on Everest McDade on more than one occasion? A. Oh, yes, sometimes this would be a matter of his relationship with his father, sometimes with his brother, sometimes with his wife, sometimes with his children, his children at times would feel, well, they would make noise and so forth, Everest would sometimes feel as I think most parents would feel, and I'm not paying much attention to this, sometimes there seems to be an overreaction within the framework of the family that I would say most of the pressures, now, there were times that—let me clarify this—there were times when individuals who stood consciously and unconsciously as symbols of authority would also

bring about a fairly dramatic reaction from Mr. McDade, Everest McDade.

"Q. Will you describe these dramatic reactions? What did Everest do when he succumbed to these particular measures that you mentioned? A. Well, I think there are two, three patterns, one is rage, sometimes that rage would be one in which he would show a great deal of intellectual skill in handling— just as I am no particular businessman, certainly I as no barrister, but at times he would tackle the law books with what to my untutored mind amounted to a good deal of skill and I don't know how much confusion for his barrister and sometimes he would have, frankly, a rage reaction in which he would break things sometimes, I think a television set on one occasion was pretty well damaged. At other times a rage would be to me a rather forlorn and pathetic thing, it would be withdrawal into almost that of a child. I have been up to his home once or twice when these things have occurred when Everest would withdraw like a small boy that didn't know where to go. He would, I think, go in a closet, wouldn't speak to his family, wouldn't speak to me, very difficult to establish contact. So, there are several different patterns, but I might say that there were several ways of relieving this thing, sometimes moisture, again sometimes pretending that he was—

"Q. (Interposing) Yes. A. That somebody did love him, simple a phrase as that, I'm not saying for a moment that Everest always saw love clearly. It's a thing we don't always see clearly, but there were these two or three dated patterns which I think fairly can be described as rage.

"One pattern, sometimes handled skillfully and intellectually, sometimes handled in terms of motor behavior that was poorly done and sometimes handled in a pattern of just withdrawal and forlornness and not knowing where to turn.

"Q. And you say during that paritcular pattern he reminded you of a child, would that be a fair statement? A. I would think that's a fair thing, I think that's a fairly adequate description, certainly a troubled human being who would withdraw and it's perfectly true that the more flamboyant behavior is the more distressing effect he had, more upset. If somebody is breaking something and if somebody just goes off in a corner and does not face things— now, I could say this—these patterns would occur as I observed them, sometimes it would be months apart, sometimes there would be several of them during the particular time, sometimes these would relate to pressures within the family, and by 'the family' I mean all three generations.

"Q. And how long duration would these withdrawal patterns occupy, Doctor, could you estimate? A. It's hard to say, sometimes an hour or sometimes a day or so.

"Q. During the periods when he was withdrawn as you have described, was he, did he have sufficient mental capacity to transact business? A. Well, one or two that I have seen of withdrawal patterns I would say no, because he did not want contact with anybody at that time, couldn't tolerate it, let's put it, contact with anybody at that time.

"Q. As part of your treatment, Doctor, did you prescribe various sedatives to relax? A. Yes, sir, we have used various sedatives, barbiturates originally, sometimes paraldehyde, there are a series of these vairous tranquilizing drugs which, as they began to come in, we began to use some of those, but he has had frequently and usually, indeed usually, some type of relaxing tranquilizing type of drug.

"Q. Do you know whether he took those various drugs that you prescribed for him? A. Yes, I would say he took them and took them pretty regularly. Now, the situation was one in which I never with Mr. McDade—just here are two or three hundred of them (indicating some papers), it was a matter of fairly close contact. I would always telephone the Signal Mountain Drug Store there, contacted them about the amount of drugs he was to have and when he was to have them.

"Q. Now, during the latter part of 1949 and the early part of 1950 he, of course, was under your care suffering from these symptoms that you have described, was he not, Doctor? A. I can't say how much he was suffering at that time. I would say certainly the basic pattern was there, that is, the vulnerability, the sensitiveness.

"Q. And I think you said that he was particularly vulnerable to pressures from members of his family? A. Yes, or things who stood for such people.

"Q. When did he leave your care and for what purpose, if you know, Doctor? A. I think it would be about May of 1954, as I recall it, no, '55, I believe that was it. At any rate, the situation finally devel-

oped with the ultimate sale of his own orchid or his own greenhouse there, contact became increasingly difficult and I thought it would be sensible for him to go to Highland Hospital and he went to Highland Hospital at that time.

"Q. That is near Asheville, North Carolina? A. Asheville, North Carolina.

"Q. Do you know whether he was a patient over there for some time? A. I had rather regular letters, yes. I don't know exactly when he changed from in-patient to out-patient status but I would say I think that would have to be developed from Mr. McDade or from other testimony, but I believe for certain about a year he was an in-patient there.

"Q. Doctor, will you state again, it's already slipped my mind, the exact diagnosis, the terms that you applied to his condition? A. I used the phrase obsess, there is the technical term obsessive compulsive neurosis. Now, a neurosis is a, I think we might say, acting out a behavior. In 1956 that might have been appropriate, in 1926 or '36, depending on the age of the patient, the particular type of neurosis that I have referred to is the obsessive compulsive, this means occupation, thoughts go over and over and over in one's mind on the obsessive level and the compulsive level refers to behavior, for example, I would say that having to line his clothing with cotton would be a compulsive manifestation, having to reach for water and moisture at times would be a compulsive behavior, thoughts of moisture and water would be obsessive.

"Does that answer or illustrate that adequately, the diagnosis?

"Q. Yes, I think that clarifies it, Doctor. Does this have anything to do with schizophrenia? A. I think there can be a very, very fine line there, Mr. McEwan. I have looked for schizophrenia as a person who decompensates, now, to decompensate, it's just like you can say a bad heart, a person can get along with a rheumatic heart disease, for example, very well, they go up and down three flights of stairs and they get short of breath and their ankles swell and at that time we say the person enters congestive heart failure. Now, some obsessive compulsives will decompensate, they will be almost schizophrenics. I think that's as close a relationship as we can give you, sir, in its relationship to schizophrenia. I have not myself felt that Mr. McDade was a schizophrenic. I have felt that he was an obsessive compulsive who, on occasion, had a tendency to decompensate, just like the person who has run up and down steps under particular pressures and particular duress.

"Q. Would that be in connection with the pressures you mention, particularly when he was dealing with members of his family?

"Mr. Moore: We object to him leading, if you Honor please.

"The Witness: What?

"The Court: Just state your questions without leading the witness.

"Q. Were those symptoms present following these run-ins that he had with members of his family? A.

Oh, not on all occasions, on some occasions he handled it extraordinarily well, on other occasions I felt he handled them badly, that's what I referred to before in terms of this withdrawal symptoms and sometimes the rage symptoms.

"Q. Would those withdrawal symptoms be— would they approach the symptoms you have given us that are associated with schizophrenia? A. Approach, yes, we approach that, all of us in our dreams at night, good gosh, all of us dream, that is about as schizophrenic a behavior as you can have, but that doesn't mean you are schizophrenic.

"Q. You say that is a type of schizophrenia, the dreams that we have? A. I said that the schizophrenic lives in a dream world, you and I, we dream but that doesn't mean we are schizophrenic.

"Q. It is a question of degree then? A. I think it is a question of degree and the total picture of the whole human being."

Everest testified in his own behalf and in addition acted as his own attorney in interrogation of the witnesses. The Chancellor and jury therefore had full opportunity to observe him over a period of several days.

From the Chancellor's Findings of Fact we quote:

"The orchid business was started as a hobby by Mr. and Mrs. Clint McDade in 1939. It developed such an expensive hobby that they finally decided to form a partnership and sell plants and blooms. The business grew rapidly. Rare varieties of plants were purchased for propagation purposes.

"The greatest contribution that was made to the orchid growing industry in the South was made by Everest McDade. He succeeded in cracking a genetics problem involving growing orchids from the seed. This new discovery provided for germination of seeds to take place in sterile glass flasks. Prior to this discovery, most of the seedlings were eaten up by fungus before they matured. Everest McDade became an authority on growing orchids and wrote several articles that were published in the official recognized publications of the orchid industry. He worked up a long-range program for crossing and developing new species of orchids. Clint McDade did not approve of the plan, for the reasons that the process involved to produce new strains requires seven years for each plant to mature, and such a program would retard the production of the many varieties then being successfully grown that were in great demand.

"This clash with Everest was the beginning of a series of serious mutual antagonisms. Everest McDade was also having trouble with key employees at the nursery. His inability to get along with these employees presented a serious problem. By 1948 Clint McDade considered that Everest was emotionally and temperamentally unstable and felt it was necessary to get him out of the orchid business. Clint McDade depended heavily upon his wife and Neil to back him up in his insistence that he, Clint, be made President of Clint McDade and Sons and that Everest be let out. Clint McDade was direct, blunt and determined that, in the interest of the business, Everest had to be removed. Neil McDade and Grace

Everest McDade were equally aware of the situation, were in accord with Clint McDade, but discreetly withheld their real purpose in wanting him out of the business, by encouraging Everest to go back to college. Neil McDade assured Everest of an income of $10,000.00 per year from the various businesses so long as he needed it, and Grace Everest McDade concurred in the arrangement. With this understanding, Everest McDade stepped down from his executive position, left the business and returned to the University of Chattanooga. At a corporate meeting of Clint McDade and Sons held in December of 1948, Grace Everest McDade and Neil McDade voted to give Everest a salary of $10,000.00 per year from the various enterprises, which he received for the year 1949. They were agreeable to entering into a binding obligation between the corporations and Everest McDade to make these payments so long as Everest needed it, but, in reality, so long as he stayed away from the businesses. The attorney for the Company, who was also Clint McDade's personal attorney, advised that the contract, to be valid, had to be made for one year and could be renewed annually. Clint McDade was vigorously opposed to this action, on the ground that Everest would be going to the University in 1949 and would not be employed and to pay him a salary would, in effect, be allowing him to withdraw dividends at a time when no dividends were being declared. The family conflict concerning a $10,000.00 salary to Everest McDade was the first consorted opposition that Clint McDade encountered in the control of the family businesses from Neil and his wife. It made him feel that Neil

and his wife had turned against him. There is no room for doubt that the purpose of the contract was to pay Everest to stay away from the businesses. In the Fall of 1949, when Clint McDade learned that Neil and Grace Everest McDade intended to renew Everest McDade's contract for 1950, Clint McDade went into a rage.

"Clint McDade down through the years made all arrangements for bank loans. The banking was done at the Hamilton National Bank. In 1948 the bank called for four notes of $28,500.00 each, executed by Clint McDade & Sons to members of the family, to be put up as collateral for an existing loan. In the Fall of 1949, when the bank learned of the brewing family troubles, it called for additional security. Clint McDade on the cash value of his life insurance made a personal loan and took up the bank loans made to McDade enterprises. In paying off the bank loan, he obtained the four family notes of $28,500.00 each, one of which belonged to Everest McDade, which he retained as security for the money he paid the bank. The question as to whether or not Clint McDade was a volunteer in paying off the debt to the bank has not been raised. Clint McDade was the authorized financial agent of all of the enterprises; he was acting with the scope of his authority, when, upon demand of the bank for additional security, he arranged to pay off the loans with his funds. The Hamilton National Bank, upon being paid, turned the collateral notes over to Clint McDade, in line with its established practice and policy. Clint McDade then held the same collateral for the repayment of his loan as the bank held and, in addition,

under the laws of subrogation, would be entitled to hold the four family notes until he was repaid the equivalent of the previously existing bank loans.

"In the Fall of 1949, Clint McDade discontinued making interest payments on the $28,500.00 note. This was followed by telegrams to Everest and Edith McDade, demanding payments of their demand notes held by him and the corporations. Mr. and Mrs. Everest McDade became panicky. They considered that financial pressure was being put on them to force them to sell their interests in the McDade enterprises. Neil McDade, either directly or indirectly, contrived to bring about a situation where Edith and Everest McDade would have to choose to try to exist without any income or accept his 'take-it-or-leave-it' offer to sell him and undislosed principals their interests in the McDade enterprises. In justice to Neil McDade, the record should show that he and Grace Everest McDade were perfectly agreeable to fulfilling the promise to Everest McDade to pay him $10,000.00 per year as long as he needed it. The Court finds from the proof that keeping Everest away from the businesses was reasonably worth $10,000.00 per year. It gave Neil a chance to work without interference, in an atmosphere of freedom from bickering, arguing, threatening and being threatened. Neil McDade had reached the stage where he was no longer willing to continue to handle family business under the then prevailing conditions. From 1950 to the present, Neil McDade's unhampered management of the businesses proved to be more profitable than it was during the two preceding

years under management by Everest and Neil McDade.

"Everest and Edith McDade hired Raymond Witt to represent them. Everest related all of his problems to his attorney. He expressed a desire to sue to recover on the $28,500.00 note, which did not mature until about April 1, 1950, to enforce the agreement with Neil McDade to receive $10,000.00 per year as long as he needed it, to obtain $15,000.00 that Edith McDade's interest in Semmes Nursery earned since the closing of its fiscal year in August, 1949, in line with the established policy to make withdrawals in January from current year's profits to take care of income tax payments. Everest McDade explained to Mr. Witt about having a tax payment due in January, about the demand notes and that he had been under treatment by a psychiatrist. Everest McDade was accompanied by Mr. Witt to a meeting of Clint McDade & Sons, Inc. for the purpose of exploring the possibility of working out a solution of the various problems. The minutes of the January 6, 1950 meeting of one of the corporations record that,

" 'Witt asked questions, which precipitated a general discussion as to the situation of Everest McDade as to this and to other c o m p a n i e s in which Everest was interested. This discussion was on a dignified, frank and helpful basis and served to clarify the general situation, including a suggestion by Mr. Witt that possibly the other members of the family would be willing to make some offer whereby they might acquire the interests of Everest McDade, not only in this Company, but in

the other Companies as well. There was considerable discussion, and it was finally determined that Mr. Witt would be given access to the books of the Company and the other Companies so that he might acquaint himself with the situation and condition of the various companies—and that when he had so acquainted himself, the others would make an offer of as much as they felt could properly be done by them to acquire Everest McDade's interest. At this point Everest McDade and Mr. Witt withdrew from the meeting.'

"There resulted an offer on a take-it-or-leave-it basis by Neil McDade to purchase all the interests in the various McDade enterprises that were owned by Everest and Edith McDade for $150,000.00. Mr. Witt first submitted this proposal to Edith McDade and then to Everest McDade at their home on January 14, 1950. The offer was read by Everest and Edith McDade and thoroughly explained to them by their attorney, after which it was signed reluctantly. The agreement is Exhibit 3 to the testimony of Neil McDade and provides in part as follows:

" 'Everest McDade and wife, Edith Porten McDade,—hereinafter called "Sellers", do hereby agree to sell, transfer, assign and convey to Neil McDade— hereinafter called the "Purchasers", individually, and as agent for undisclosed principals the following items—

" '(1) 25% of the outstanding capital stock of Clint McDade & Sons, Inc.;

" '(2) 25% interest in the partnerships known as Semmes Nursery;

" '(3) 16% interest in the partnerships known as Southland News Company;

" '(4) 16% of the common stock of Southland News Company, a corporation;

" '(5) 25% of the common stock of Pepsi-Cola Bottling Company,

" 'Purchasers agree to pay the "Sellers" $150,-000.00—as follows:

" '(1) $25,000.00 in cash upon deliver and execuiton of the assignments—

" '(2) One note in the sum of $125,000.00 with interest from date at 2½% payable annually—principal on said note being due in the amount of $7,500.-00 annually—.

" '(3) The stock of Clint McDade & Sons, Inc., Southland News Company and Pepsi-Cola Company —shall be placed in escrow to secure payment of the above note.

" 'The parties—further agree—

" '(1) All notes payable signed by Everest McDade, Edith Porten McDade, Lawrence Porten, or Union Artificial Limb Company, a partnership, as makers or co-makers, which are presently existing legal obligations of any of the parties named above, shall be cancelled or assigned to Everest McDade and/or Edith Porten McDade.

" '(2) Purchaser agrees to indemnify Everest McDade and/or Edith Porten McDade from any and all liabilities from all taxes of any nature whatsoever, contingent or otherwise—.

" '(3) Purchaser agrees to pay Edith Porten Mc-
Dade prior to 1/10/51 an amount in dollars equal to
the amount by which her individual Federal and
Alabama income tax is increased, due to the inclu-
sion—of the income from Semmes Nursery, covering
the period from September 10, 1949 to the date of
this agreement—.

" '(4) (This covered 1947 Hudson sedan, which
purchaser could take at book value.)

" '(5) Purchaser is given a period of sixty days
from the date of this agreement to complete the
purchase.'

"Sixty days were allowed for completion of the
purchase, which, along with the sale of Clint Mc-
Dade's interests, involved drafting sixty-four in-
struments. Mr. Homer Hardy was representing Neil
McDade and Mr. Paul Campbell, Sr. represented
Clint McDade. Mr. Hardy, a tax attorney, and C.P.
A. was in the midst of his busiest season. He re-
quested Mr. Witt to draft the necessary agreements
for closing the sale after Everest and Edith McDade
accepted the offer to purchase. Mr. Witt was paid
$5,000.00 by Everest McDade for his services in
carrying on the negotiations, which brought about a
contract acceptable to both Edith and Everest Mc-
Dade. He received $2,000.00 from Neil McDade and
the corporations for drafting the closing papers to
be executed by all of the parties, including the clos-
ing of Clint McDade's sale. The drafting of these
instruments involved much professional skill, respon-
sibility and time. Everest and Edith McDade sue to
recover the fee of $5,000.00 paid Mr. Witt, on the

grounds that he was secretly acting in behalf of adversary parties.

"The reasonableness of the fee is acknowledged. The only issue for determination is whether or not on January 14, 1950, when the contract was signed, was Mr. Witt then also representing Neil McDade and/or undisclosed principals. The undisputed proof is that, when the sale was negotiated, Raymond Witt was representing Edith and Everest McDade exclusively, with no reason to anticipate he might later be called upon to draft the closing instruments. From the terms of the agreement it was obvious that a number of instruments would have to be drafted. The contract was silent on who would pay for the drafting services. This work was necessary in order to get the trade consummated. Before Edith and Everest McDade were billed for and paid the fee of $5,000.00, they were fully informed by Mr. Witt that he was paid or would be paid $2,000.00 by the purchasers for drafting the instruments of transfer needed to close out the sale, not only of Everest and Edith McDade's interests, but also of Clint McDade's.

\* \* \* \* \* \*

"The jury finding that on January 14, 1950 and February 21, 1950 Everest McDade did not have sufficient mental capacity to enter into a valid contract does not of itself authorize a Court of Equity to cancel the contract, in the absence of some other equitable ground. Massachusetts Mutual Life Ins. Co. v. Hardwick [D.C.], 116 [118] F. Supp. 485. If the contract was entered into in good faith, without

actual or constructive knowledge of mental incapacity, for a consideration, even though that be less than the reasonable value, the contract would not be set aside.

"The jury found that Neil McDade and Grace Everest McDade knew that Everest McDade was of unsound mind in January and February, 1950. Neil McDade and Grace Everest McDade knew that Everest McDade's income was to be cut off as of January 1, 1950, that telegrams were sent demanding payment on demand notes, a thing unheard of in the family during previous years, that Edith McDade, contrary to an established practice, was denied the right to withdraw part of her $15,000.00 share of undistributed profits in Semmes Nursery to be used to meet the January 15, 1950 tax payment, and they participated in and had full knowledge of what transpired at the December, 1948 and 1949 meetings of Clint McDade & Sons, Inc. which were attended by Everest McDade. Knowledge of the existing facts and circumstances coupled with the jury's finding, imputes to Neil McDade and Grace Everest McDade fraud and bad faith as a matter of law.

"The contracts of January 14, 1950, February 21 and February 22, 1950 between Neil McDade, for himself and as agent for Grace Everest McDade, and Everest McDade, are set aside.

" 'A contract with an insane person, by one having knowledge of his incapacity, may be set aside on the ground of fraud.'

" 'Knowledge or information such as would lead a prudent person to believe that the other party to

a contract is of unsound mind is such evidence of bad faith as will avoid the contract.' Pritchett v. [Thomas] Plater & Co., 144 Tenn. [406] 407, [232 S. W. 961] Headnotes 6 and 7.

"See also 17 C. J. S. Contracts sec. 418.

"The contract of sale having been set aside as to Everest McDade, it cannot be enforced against Edith McDade for the obvious reason that she joined Everest McDade in selling both her and his holdings in the McDade enterprises for the lump sum of $150,-000.00 without stipulating what part of the purchase money was being paid for her undivided one-fourth interest in Semmes Nursery. The contract, not being divisible, must, therefore, be set aside in toto.

" 'An entire contract, in its legal interpretation, is an unconditional agreement for the whole of the several articles, or number or quantity of goods and chattels, contracted for, and precludes by its terms, and equally by the plain intention of the parties, all idea of divisibility or appointment.' Coleman v. Hudson, 34 Tenn. 462 [463]; Barnes Bros. v. [Black Diamond] Coal Co., 101 Tenn. 354 [47 S. W. 498]; Brockett v. Pipkin, 25 Tenn. App. 1, 149 S. W. (2d) 478.

"The book value placed on Edith McDade's one-fourth interest in Semmes Nursery by Neil McDade was $45,000.00 plus $15,000.00 in earned but undistributed profits at the time of sale. This same figure was used in selling Edith McDade's interest in Semmes Nursery to Clint McDade. Two or three months later Clint McDade purchased Fannie Coflin's one-fourth interest in Semmes Nursery for $60,000.00

after she had received $15,000.00 in undistributed profits. Clint McDade thereby became sole owner of Semmes Nursery.

" 'A court of equity, in decreeing rescission or cancellation of a contract, applies general rule that when a court of equity obtains jurisdiction, it will proceed to administer full equity, and adjust the rights of all the parties and give complete relief.' Baird v. McDaniel Printing Co. [25 Tenn. App. 144], 153 S. W. (2d) [135], 136. * * *"

The record shows Everest to be a man of great ability and mental capacity and yet he has been so emotionally unstable as to require psychiatric treatment regularly for the past ten years. Two quotations come to mind:

The first from John Dryden's "Absalom and Achitophel".

"Great wits are sure to madness near allied and thin partitions do their bounds divide"

The second is from Seneca's "De Tranquillitate Animi 15".

"Nullum magnum ingenium sine mixtura dementiae". (There is no great genius without a tincture of madness).

An advisory jury has found that Everest was not possessed of sufficient mental capacity to execute the contracts of January 14, 1950. The Chancellor accepted and adopted the finding of the jury on this issue. The evidence does not preponderate against the finding of the jury and the Chancellor. Hence, Assignments of error II, III, and IV are respectfully overruled.

■ Assignments of error Nos. V and VI are as follows:

## "V.

"That the Chancellor erred in finding and entering a decree that Grace Everest McDade and Neil McDade knew that Everest McDade did not have sufficient mental capacity to execute the contract on January 14, 1950 and February 21, 1950 because there was no evidence to support such finding since all the evidence on this issue preponderated against Grace McDade and Neil McDade knowing or having reason to believe that Everest lacked sufficient mental capacity to know and understand the effect of his executing the contracts of January 14, 1950 and February 21, 1950.

## "VI.

"It was error for the Chancellor to submit as an issue to the advisory jury the question of whether or not Grace McDade and Neil McDade knew on January 14, 1950 and February 21, 1950 that Everest McDade did not have sufficient mental capacity to execute the contract of that date because there was no material dispute in the evidence on this issue and all the evidence indicated that Everest McDade had sufficient mental capacity to execute the contracts."

The evidence shows that Neil and Grace Everest McDade, brother and mother of Everest McDade, were thoroughly aware of Everest's mental condition prior to and on January 14, 1950. Assuming that Everest was mentally incompetent to contract with them as found by

the jury and the Chancellor, then certainly the evidence preponderates in favor of the finding by the jury and the Chancellor that Neil and Grace Everest McDade knew of such incompetency. Therefore, assignments of error V and VI are respectfully overruled.

Assignment of error No. X is as follows:

"That the Chancellor erred in holding and entering a decree that Everest still lacks mental capacity and is not competent to handle involved business affairs."

The evidence supports the finding of the Chancellor and the assignment of error is respectfully overruled.

Assignment of error No. XII is as follows:

"The Chancellor erred in not finding that Everest McDade had ratified the contracts of January 14 and February 21, 1950 by accepting and retaining from March, 1950 up to and during the trial all monthly installment payments made on the notes given to Everest and Edith as a part of the consideration paid them for their interests in the different McDade businesses."

The evidence does not preponderate against the finding of the Chancellor that the mental incompetency of Everest McDade to contract with Neil McDade et al. has continued to the time of the trial. The record does show that very soon after the contracts were executed Everest sought to disaffirm them and has never done any act subsequently to indicate a different purpose or intention.

Further, Everest did make an offer to return all of the property received by him under said contract less

the money actually spent by him. Of course he could not return the money actually spent because he had no property other than his interests in the McDade enterprises. Under these circumstances the Chancellor properly allowed Everest to maintain the suit to set aside the contracts without making tender of that portion of the purchase money which Everest had already expended. We see no prejudice to Neil McDade et al. from such action because upon a final accounting all of the matters between them and Everest will be fully adjusted.

Accordingly, assignment of error No. XII is respectfully overruled.

Assignment of error No. XV is as follows:

"The Chancellor erred in holding and entering a decree as a matter of law that the contract executed by Edith, with her husband, Everest McDade, where she sold her interest in Semmes Nursery, was not divisible."

We concur in the finding of the Chancellor that under the facts of this case the contract of Edith McDade is so closely connected to and interwoven with those of her husband, Everest McDade, that her contract must be set aside if those of Everest McDade's are set aside. Therefore, assignment of error No. XV is respectfully overruled.

Assignment of error No. XIII is as follows:

"The Chancellor erred in finding and entering a decree that the contracts made by Everest and Edith McDade on January 14 and February 21, 1950 were void because Neil and Grace McDade were guilty of fraud and bad faith as a matter of law since the

evidence preponderated against any fraud and bad faith on the part of Neil or Grace McDade or anyone acting on their behalf.''

We do not think that Neil McDade and his mother, Grace Everest McDade, sought to defraud Everest Mc-Dade in the sense that Jacob stole the birthright of his brother, Esau. On the contrary we think they felt that their conduct was necessary in order to salvage at least a portion of the McDade enterprises which were apparently headed for financial disaster as a result of the irreconcilable clash of personalities between Clint Mc-Dade and Everest McDade.

The family circle had already been broken; the good luck charm had been lost. The breach between Clint and Everest had widened and Clint had determined that Everest must go. Neil and Grace Everest McDade assisted Clint in this plan by urging Everest to surrender the presidency of Clint McDade and Sons and go back to school. Everest agreed to do so upon the assurance to him by Grace Everest McDade and Neil McDade that he would receive $10,000 a year as long as he needed it.

Even after Everest had surrendered the presidency of Clint McDade and Sons, Clint McDade continued to apply financial pressures against him and his wife, Edith McDade, as discussed in the Chancellor's finding of fact. Everest was in extremis financially and emotionally making him very vulnerable to the business pressures which were brought to bear upon him. Neil McDade and Grace Everest McDade acquiesced in such financial pressures.

When Neil McDade, Grace Everest McDade and Dorothy McDade Ferguson contracted with Everest McDade and wife, Edith McDade, under these circumstances they

knew or should have known that such contracts might later be brought before a court for adjudication as to legality. They elected to hazard the chance first that the contracts might not be brought up before a court and in the second place, that such contracts might be upheld if contested.

When they contracted with Everest and Edith McDade under such circumstances they became guilty of fraud in law though not necessarily fraud in fact. Bank of Blount County v. Dunn, 10 Tenn. App 95, 9 Am. Jur.— Cancellation of Instruments—Section 17, page 363.

Assignment of error No. XIII is therefore respectfully overruled.

Assignment of error No. XVI has been considered and is overruled.

 Assignment of error No. XI is as follows:

"That the Chancellor erred in finding and entering a decree that 'Neil figured the book value of Edith McDade's interest in Semmes Nursery at $45,000.00. Edith had no part in arriving at that value, and therefore, cannot be charged with having agreed upon that figure.' Further, the Chancellor erred in reassessing the value of Semmes Nursery to be $65,000.00."

Again the evidence does not preponderate against the finding of the Chancellor as to the value of Edith McDade's one-fourth interest in Semmes Nursery and therefore, his action will be affirmed. T. C. A. Section 27-303.

Assignment of error No. XI is therefore overruled.

Assignment of error No. XIV is as follows:

"The Chancellor erred in finding and entering a decree that the contract of February 10, 1950 wherein Everest and Edith McDade agreed to apply any tax refund from the reallocation of the income of Southland News Company, a partnership, was without consideration and not binding."

We deem it unnecessary to determine whether this particular contract of date February 10, 1950, by Everest and Edith McDade was without consideration. In our opinion the contract was ancillary and to some extent explanatory of the other contracts of Everest and Edith McDade of date January 14, 1950 and February 22, 1950.

Since we have upheld the action of the Chancellor in rescinding and setting aside these primary contracts, then necessarily the ancillary contract of date February 10, 1950, should also be set aside. Hence assignment of error No. XIV is respectfully overruled.

Assignment of error No. IX is as follows:

"That the Chancellor erred in holding the note of $28,500.00, maturing April 1, 1950, payable to Everest McDade, was not cancelled by the agreements of January 14, 1950 and February 21, 1950 and this should not have been allowed as an amount due Everest as part of the Chancellor's accounting."

The $28,500 note referred to in assignment of error No. IX was a note executed to Everest McDade by Clint McDade and Sons, Inc. dated September 30, 1948, and due and payable April 1, 1950.

This note represented Everest's share of profits in Clint McDade and Sons, Inc. for a given period. Instead

of paying out the money as profits or dividends, the officials of this firm of which Everest was the president in 1948 followed a practice of issuing notes from the company to the various owners in amounts proportionate to their respective ownerships in the business.

Everest, Clint, Neil and Grace McDade each owned 25% of the stock of Clint McDade and Sons, Inc. and therefore, under the practice above described, each of them held a note for $28,500 from Clint McDade and Sons, Inc.

In 1948, Clint McDade and Sons were indebted to the cross-defendant, Hamilton National Bank of Chattanooga and the $28,500 note belonging to Everest along with some other family notes were pledged to secure the payment of the principal indebtedness to the Bank. These collateral notes were held by the Bank until sometime in July, 1949 when Clint McDade borrowed on his life insurance and paid off the indebtedness to the Bank and all of the collateral notes were turned over by the Bank to Clint McDade.

Everest McDade became very much disturbed by Clint McDade thus receiving possession of his note. Later in his cross bill he sought recovery against the Bank for the surrender of this particular note of $28,500 to Clint McDade.

When the contracts of January 14, 1950, and February 22, 1950, were consummated resulting in the transfer of the various interests in McDade enterprises the four notes for $28,500 each payable to Everest McDade, Grace McDade, Neil McDade and Clint McDade were all cancelled. .

Therefore, when the Chancellor decreed that the contracts of Everest and wife, Edith McDade, of date January 14, 1950, and February 22, 1950, should be rescinded and set aside, it was entirely proper that the Chancellor should also adjudge that Everest was entitled to have his note of $28,500 against Clint McDade and Sons, Inc. reinstated.

However, it also appears that as a matter of equity if Everest McDade is entitled to have his note reinstated and revived then Neil McDade, Grace Everest McDade and Dorothy McDade Ferguson are also entitled to have revived as claims in their favor against Clint McDade and Sons, Inc. the three notes for $28,500 originally payable to Neil, Grace and Clint.

The assignment of error No. IX is therefore sustained and the Chancellor's decree in regard to the $28,500 note will be modified accordingly.

Assignments of error VII and VIII are as follows:

## "VII.

"That the Chancellor erred in finding and entering a decree that Neil and Grace McDade and the corporate cross-defendants to the cross-bill of Everest were indebted to Everest McDade in the amount of $70,000.00 based on a verbal contract supposedly entered into in December, 1948, whereby Neil and Grace McDade and the corporate defendants to the cross-bill agreed to pay Everest McDade $10,000.00 per year as long as he needed it provided he stay away from the businesses and did not enter into a competing business since such contract was to begin

January 1, 1950. There was no evidence to support such a finding, it was not alleged in the cross-bill, but even if it was, it would be void because of the statute of frauds and the fact that it was vague, indefinite and lacked mutuality.

## "VIII.

"That it was error for the Chancellor to allow the guardian ad litem of Everest McDade to amend his cross-bill so as to state:

" 'That the terms of the contract agreed upon in December, 1948, whereby Everest McDade was to receive from the McDade corporations $10,000.00 per year as long as he needed it, were made between officers, directors and stockholders then having controlling interest in said corporations, and the basis for the agreement was to get Everest McDade out of Clint McDade & Sons, Inc. and get him to forbear from coming around Clint McDade & Sons, Inc., unless requested to do so, or from competing with Clint McDade & Sons, Inc. That Everest McDade carried out his part of the agreement, and by the terms of a later agreement Neil McDade and Grace Everest McDade acquired Clint McDade's stock in said corporations and thereby put themselves in a position to fulfill the terms of the contract to pay Everest McDade $10,000.00 per year.' "

In our opinion these two assignments of error are well-taken and must be sustained for two reasons:

In the first place, it appears that such a contract, if entered into between the parties, would be void and unenforceable for indefiniteness. At most it would be a

contract valid from year to year and terminable at the will of either party at the end of any year. Savage v. Spur Distributing Co., Inc., 1949, 33 Tenn. App. 27, 228 S. W. (2d) 122.

In the second place we think the evidence preponderates against the finding of the Chancellor that Neil and Grace Everest McDade contracted to pay Everest McDade $10,000 a year as long as he needed it. From the testimony of Everest McDade as to the transactions relating to the $10,000 per year we quote as follows:

"Now, the year of 1948 I was in my third year of being president of the orchid business and, as I told you yesterday, there were some arguments between me and my father as to money and my father wanted to be president and that my brother and mother were consistently voting me in and not going along entirely with my father's wishes. He was getting all of the money he wanted out of it but he did want to be president.

"So my brother called me down to have several conferences with him during 1948, my brother and Atlee Bird, who is my brother's bookkeeper for all of the businesses, and they suggested that I resign as president of the orchid business. They told me that my father wanted me out and wanted to get rid of me, wanted to cut off my money. They said they represented my father, they were acting for him, wanted me to resign, said they would guarantee me an income of my current income at that time on the books was about $30,000 a year—I wasn't getting that much money but this was what was accruing to me and being credited to me on the books. So they

said they would guarantee that I would actually receive $10,000 a year if I would step out and would protect me from my father's threat to cut off all my monies if I would voluntarily resign.

"I repeatedly refused this offer, but after several meetings in December 1948 I finally agreed to resign as president and my brother suggested that I go back to school—I never finished school—and learn a trade of my own or profession of my own and I never worked for anyone but McDade family interests and hadn't had any experience in other lines and this was a good suggestion. So it was finally decided that I would take engineering for greenhouse engineers since that is what I was interested in and would eventually do some good at and would resign and a consideration for my resigning was that knowing that my father would cut off my income that my brother would protect me by writing into the minutes of the meeting, or giving me a contract, for $10,000 guaranteed income a year.

"Mr. Moore: If your Honor please, we object to that because he was only a minor stockholder. It was a corporation and no minor stockholder could make any agreement about what a corporation is going to do, if your Honor please.

"The Court: Overrule the objection. That is one of the averments of the bill.

"The Witness: My brother and Atlee Bird were both directors of the business and they stated that they were acting as agent for my father and trying to help my father and mother solve their argument.

"So December 9th a directors meeting at Clint McDade and Sons was held in which I resigned and in which I expected them to come through with a $10,000 a year guaranteed income and this would not be for anything, this would just be a guarantee that I would actually get that proportion of what was really due me.

\* \* \* \* \* \*

"The Witness: The particular meeting in which this occurred was at Paul Campbell's office in the Hamilton—in the—I can't recall the name of the building where his office is—Paul Campbell was the attorney for the various businesses in their directors meetings and stockholders meetings. He was also my father's personal attorney and in this directors meeting my father had been so mad at me that he wouldn't even speak to me and he was mad at my mother and had been threatening her with divorce if she wouldn't get me out of the business and vote with him and cut off my pay.

"So there was considerable tension at this particular meeting and I resigned as president. Now, my brother did just exactly what he said he was going to do and the directors that he said he represented and stockholders did exactly what he said they were going to do, they voted $10,000 per year guaranteed income to me every year.

\* \* \* \* \* \*

"The Witness: Paul Campbell said that in the interest of the corporation he wanted to inform them

that it was illegal for them to enter into a contract for more than one year.

\* \* \* \* \* \*

"The Witness: I disagreed. So then I was voted $10,000 income, not salary, income, for one year with a gentlemen's agreement to continue this each year.

\* \* \* \* \* \*

"The Witness: So my mother, my brother, Atlee Bird, talked to me about this point as they assured me that each year they would agree that — they agreed now each year to renew the $10,000 if it were legal for only one year, that they didn't want to do anything illegal and that they would make it for $10,000 this year and then each year they would renew it in the same way. I agreed to this. My father dissented, he wouldn't vote for it.

"Now, Paul Campbell said that it was not legal for the corporation to vote me a $10,000 guaranteed income, that they would have to say it was for some services or something I did. I denied this, that actual income profits from the corporation could be given to me as such without going through the foolishness or deception of saying that it was because I was consultant or because I was doing something because it wasn't, I was being guaranteed my just share of the profits.

\* \* \* \* \* \*

"The Witness: This was a directors meeting of Clint McDade and Sons, the orchid business. So again my brother and mother, Atlee Bird, I believe — I think Bill Schroeder was also there, who was an

578

officer of the corporation, at least my brother and mother definitely told me that they didn't want to do anything again that was illegal and so they would pay me $10,000 a year as they had promised for my resignation and they would say that it was for services that I was to be consultant. Of course, nobody wanted actually me to consult. My father was mad at me, he didn't want me in the business and my brother had made a deal with me that he would—I would go to school and there was—this didn't bear out my agreement with them at all. So it was finally agreed that they would pay me $10,000 a year, would renew this every year and would say it was for services, and this was in return for what I had promised, to step out as president, not be a director, not to receive any salary or anything off of the business except this one guarantee, and this was all as proposed by my brother and Atlee Bird.

"So, they actually did vote me what amounted to $10,000 a year and paid. So in June 1949 I started to summer school to finish my B.S. in chemistry, which I had started, I think, eighteen years before. I'd like to get Exhibit D-17A, it is a series of notes clipped together. I would like to file this series of notes, having a total value of $28,500. They are payable to Everest McDade and most of them owed by Rivermont Orchids." (Tr. Vol. III, pp. 398-409)

It is to be noted that the Chancellor, in addition to allowing Everest recovery for $10,000 a year for the seven-year period of 1950 through 1956, expressly reserved a decision as to the accounting by Neil McDade and Grace Everest McDade to Everest McDade for excess salaries drawn by them during this period.

From the Chancellor's final decree we quote as follows:

"It further appears to the Court that so long as Everest McDade needs it, he is to be paid $10,000.00 per year by Neil and Grace Everest McDade, less any income he earns for personal services, if he remains away from and forbears from competing with Clint McDade and Sons, Inc., and holds himself ready to advise as consultant. No present action will be taken on the following four items, provided the total of all McDade family salaries, plus $10,000.00, does not exceed the net earnings after taxes of said corporations in any one year, and provided the payments herein specified are promptly made:

"(1) Was the sale of the assets of Southland News Company, a partnership, as a going concern, valid without the consent of Everest McDade?

"(2) By what authority did Neil McDade use Southland News Company's partnership funds for the purchase of real estate from which he personally conducts the business of Archer Paper Company?

"(3) Were corporate or partnership funds used in the purchase of Archer Paper Company?

"(4) An accounting for excess salaries, if any, withdrawn from McDade corporations by (a) Neil McDade, (b) Grace Everest McDade, (c) Ruth Clint McDade.

"Signal Nursery is not affected by this litigation." (Tech. Record, Vol. IV, p. 739 et seq.)

Everest McDade rendered no services to the McDade enterprises from and after January 10, 1950, and

in our opinion he is not entitled to any compensation as salary from the McDade enterprises for the period from 1950 to date.

That portion of the decree of the Chancellor awarding Everest a recovery of $10,000 per year for services rendered in the total amount of $70,000 is reversed.

 Everest has been declared by the Chancery Court and now by this Court to have been incompetent to contract with his brother, Neil McDade and his mother, Grace Everest McDade, on January 10, 1950, and that such incompetency has continued to the present time.

Therefore, as the Chancellor decreed, Everest is now and has been continuously since January 10, 1950, equitably the owner of the following interests in the McDade enterprises:

16% of the stock in Southland News Co., a Corporation;

16% interest in Southland News Co., a Partnership;

25% of the stock of Pepsi Cola Bottling Co., a Corporation;

25% of Clint McDade and Sons, Inc., a Corporation.

As such owner he is entitled to his proportionate share of the net earnings of these several McDade enterprises from January 10, 1950, to the present time.

Apparently Neil McDade, Ruth McDade, Grace Everest McDade and Dorothy McDade Ferguson since 1950 have been following the former custom of withdrawing

all the profits of McDade enterprises in the form of salaries and that a relatively small amount has been declared as profits eo nomine.

■ However, equity looks to substance and not to form. Everest's fair share of said profits can be determined upon a remand of this cause to the Chancery Court.

Upon such remand of course the Chancellor will take into consideration the gross profits earned by these several enterprises, the services rendered by Neil, Ruth and Grace McDade and possibly Dorothy McDade Ferguson, as well as income taxes paid by them and by the corporations, if any. Allowance will be made to Neil, Ruth, Grace Everest McDade and Dorothy McDade Ferguson for the reasonable value of their services as salaries as well as all other expenditures and claims properly chargeable against the McDade enterprises and the Chancellor will then award judgment to Everest for an amount equal to his fair proportionate share of the net profits of the McDade enterprises for the period 1950 to date.

This judgment along with the judgment in favor of Edith McDade for her interest in Semmes Nursery will be set off against the judgment and charges against Everest and Edith McDade for the return of the purchase money paid to them under the contract of date January 14, 1950, and February 22, 1950.

A decree will be entered in this Court reversing that portion of the Chancellor's decree awarding a judgment of $70,000 in favor of Everest McDade against Neil McDade, et al. and also that portion of the decree allowing

Everest McDade judgment for the $28,500 note against Neil McDade, et al.

The decree will be modified so as to allow the revival of the $28,500 note as a claim in favor of Everest McDade against Clint McDade and Sons, Inc. with the right of Neil McDade, Grace Everest McDade and Dorothy Mc-Dade Ferguson to revive the other three notes of $28,500 each in their favor as claims against Clint McDade and Sons, Inc. In all other respects the decree of the Chancellor will be affirmed.

Since Everest McDade has been declared incompetent to contract with Neil McDade et al., we think it very necessary that all the rights and obligations of all the parties to this litigation be completely and fully adjudicated as soon as possible. Therefore, upon the remand of this cause the Chancellor will determine those questions expressly reserved by him in his former decree as well as all other matters necessary to adjudicate completely the rights of the parties.

Accordingly, the cause is remanded to the Chancery Court of Hamilton County for further proceedings consistent with this opinion.

The costs of the appeal by Neil McDade, et al. will be taxed one-half against Neil McDade, et al., appellants, and one-half against Everest and Edith McDade, appellees.

Avery, P. J. (Western Section), and Bejach, J., concur.